319 P.3d 416

**Thomas Frank SCHMIDT and Lorinna Jhincil Schmidt, Petitioners/Plaintiffs–Appellants, Cross–Appellees,**

**v.**

**HSC, INC., a Hawai'i corporation, Richard Henderson, Sr., and Eleanor R.J. Henderson, Respondents/Defendants–Appellees, Cross–Appellants.**

**No. SCWC–29454.**

Supreme Court of Hawai'i.

Jan. 15, 2014.

See also 104 Hawai'i 191, 2004 WL 541878.

R. Steven Geshell, Honolulu, for petitioner.

Paul Alston, Honolulu, for respondent.

NAKAYAMA, acting C.J., ACOBA, McKENNA, and POLLACK, JJ., and Circuit Judge GARIBALDI, in place of RECKTENWALD, C.J., recused.

Opinion of the Court by ACOBA, J.

We hold that, in accordance with the text of Hawai'i Revised Statutes (HRS) § 651C–9(1) (1993)[1] pertaining to the Uniform Fraudulent Transfers Act (UFTA[2]), that the one year limitations period that begins on the date a transfer "was or could reasonably have been discovered by the claimant" commences when a plaintiff discovers or could reasonably have discovered a transfer's fraudulent nature. The Intermediate Court of Appeals (ICA), however, held that the limitations period begins when the transfer, rather than its fraudulent nature, is discovered, and resultingly affirmed the October 7, 2008 judgment of the Circuit Court of the Third Circuit (the court)[3] that dismissed the action brought by Petitioners/Plaintiffs–Appellants Thomas Frank Schmidt and Lorinna Jhincil Schmidt (collectively, Petitioners) on the ground that the statute of limitations

---

1. HRS § 651C–9 is set forth *infra.*

2. HRS Chapter 651C represents Hawai'i's adoption of the UFTA. The UFTA is a uniform act that has been adopted by 45 jurisdictions. *See* 7A *Uniform Laws Annotated*, Part II at 2–3 (2006).

3. This case involves proceedings before three different judges. As explained in greater detail *infra*, Realty Finance Inc. (RFI) initially filed a foreclosure action in the First Circuit Court under case number CIV. 97–1235–03. The Honorable Kevin S. Chang presided over the initial proceedings. *Realty Finance, Inc. v. Schmidt (Realty II)*, No. 23441, 104 Hawai'i 191, 2004 WL 541878, at *1 n. 3 (Haw.2004) (mem.).

The judgment in that case was eventually remanded to the First Circuit Court by this court in *Realty II*. The Honorable Karen N. Blondin presided over the proceedings on remand.

Following the entry of final judgment in Civ. No. 97–1235–03, Petitioners filed the action that is the subject of the instant appeal, Civ. No. 06–1–228 in the Circuit Court of the Third Circuit. The Honorable Greg K. Nakamura presided. In this opinion, the reference to "the court" is used to describe the presiding court in each of the three trial proceedings. However, the judge presiding over specific proceedings is noted.

period had run on Petitioners' action.[4] Based on this ruling, the ICA did not reach Petitioners' points of error on the merits of the case raised in Petitioners' October 29, 2008 appeal from the court's October 7, 2008 final judgment in favor of Respondents/ Defendants–Appellees, HSC, Inc. (HSC), Richard Henderson Sr. (Richard), and Eleanor Henderson (Eleanor), (collectively, Respondents). Because the ICA erred in its ruling on the statute of limitations issue and should have decided the merits of the claim raised in Petitioners' appeal, we vacate the October 9, 2013 judgment of the ICA filed pursuant to its August 30, 2013 Memorandum Opinion and remand the case to the ICA for disposition consistent with this opinion.

## I.

## A.

This case can be traced back to a complaint for foreclosure filed in the court[5] on March 27, 1997, by RFI against Petitioners, as well as Amerasian Land Co. (Amerasian)[6] and Turlington Corporation, filed in Civ. No. 97–1235–03.[7]

On June 10, 1991, Petitioners executed and delivered a promissory note secured by a mortgage to Investors Finance, Inc. (Investors) in the amount of $228,853.72. *Realty II*, 2004 WL 541878, at *1. On June 11, 1995, Petitioners executed and delivered a second promissory note and mortgage to Investors in the amount of $225,000 in a separate property transaction. *Id.* at *1. Thereafter, Investors assigned and transferred both the 1991 and 1995 notes and mortgages to RFI. *Id.* Petitioners subsequently defaulted on the notes and mortgages and RFI initiated a foreclosure action against Petitioners and all defendants on March 27, 1997. *Id.*

On February 24, 1998, the court granted a motion for summary judgment and an interlocutory decree of foreclosure for RFI, and determined the principal and interest amounts owed by Petitioners to RFI. *Id.* at *2. In the aftermath of the court's February 24, 1998 judgment, RFI sold Petitioners' notes and mortgages to another investor, Waikiki Investments 418, Inc. (Waikiki Investments), and allowed Waikiki Investments to collect the monies owed on the notes and mortgages in order to discharge the mortgages burdening the mortgaged properties. *Id.* at *3. Waikiki Investments collected a total of $534,000 from Amerasian and Lulani Properties, LLC (Lulani) before eventually defaulting on its agreement with RFI. *Id.* at *4.

RFI then filed notice reasserting its status as real-party-in-interest and resumed foreclosure proceedings against Petitioners. *Id.* After re-entering the case, RFI filed a motion for an order approving confirmation of the private sale of the subject properties on October 25, 1999. *Realty I*, 98 Hawai'i 512, 51 P.3d 379, slip op. at 9. Subsequently, on December 21, 1999, Petitioners and Amerasian filed a memorandum maintaining that the $534,000 paid to Waikiki Investments should be credited to the debt owed by Petitioners to RFI. *Id.* at 12. On January 6, 2000, RFI filed an opposition memorandum arguing that it was not obligated to credit the $534,000 payment. *Id.* In an Order filed on January 31, 2000, the court apparently agreed with RFI's position that it was not required to give Petitioners credit for the $534,000 paid to Waikiki Investments. *Realty II*, 2004 WL 541878, at *5.

Without informing Petitioners, in February 2000 RFI transferred the proceeds of the foreclosure sale to four creditors of RFI's parent company, HSC. *Schmidt v. HSC, Inc.*,

---

4. The opinion was filed by the Honorable Alexa D.M. Fujise, the Honorable Katherine G. Leonard, and the Honorable Lisa M. Ginoza.

5. The Honorable Kevin S. Chang, in the First Circuit Court, presided.

6. Neither RFI, Amerasian, nor Turlington Corporation are parties to this present action.

7. As explained in greater detail *infra*, the proceedings that are the issue of this appeal are

distinct from, but related to the proceedings in the First Circuit Court under case Civ. No. 97–1235–03 described *supra*. Hence, the facts of that case are not a part of the record on appeal. For the purposes of background, the facts of that case are taken from the ICA opinion in *Realty Finance, Inc. v. Schmidt, (Realty I)*, No. 23441, 98 Hawai'i 512, 51 P.3d 379 (Haw.App. June 27, 2002) (mem.), *available at* http://www.state.hi.us/jud/ica23441mop2.htm# , and from the supreme court Opinion in *Realty II*.

No. 29454, 2013 WL 4711524, at *2 (Haw. App. Aug. 30, 2013). The funds were transferred to Richard, Eleanor, the law firm of Goodsill, Anderson, Quinn, and Stifel, (Goodsill), and Kamehameha Schools, Bishop Estate (Kamehameha Schools). Richard was the President of HSC. Eleanor was his wife and a director of HSC. Goodsill and Kamehameha Schools were apparently creditors of HSC, and not RFI.

However, after RFI transferred the proceeds of the foreclosure sale to the creditors of HSC, this court in *Realty II* agreed that RFI should have credited Petitioners for the payments made to Waikiki Investments. *Realty II*, 2004 WL 541878, at *8. Therefore, this court reversed the court's January 30, 2000 Order and remanded to that court for further proceedings consistent with this court's order. *Id.*

### B.

On remand, the court [8] issued a December 21, 2004 final judgment with regard to the surplus sale proceeds, requiring RFI to repay approximately $537,000 to Petitioners. At this point, Petitioners were still unaware that the proceeds of the foreclosure sale had been transferred.

On March 18, 2005, the parties' counsel met to discuss RFI's payment of the December 21, 2004 final judgment. At the meeting, Petitioners' counsel received RFI's monthly bank statement for February, 2000. The monthly bank statement revealed that following the payment from the foreclosure commissioner, RFI wrote four checks, one for $54,399.55, one for $78,000.00, one for $119,393.42, and one for $165,058.42. The monthly bank statement also indicated that the ending balance in RFI's bank account was $71,857.79. However, there was apparently no indication of who received the checks.

On April 20, 2005, counsel for both parties attended a "meet and confer" regarding the four checks listed in the monthly bank statement. The results of the "meet and confer" are not a part of the record. However, it is undisputed that at the meeting, counsel for Petitioners received copies of the four checks and discovered that the checks were made "to insiders."

On July 26, 2005, counsel for Petitioners deposed Michael Chagami (Chagami), the treasurer of HSC, Inc. Chagami explained that RFI transferred the proceeds of the foreclosure sale to HSC to "satisfy certain obligations of HSC." Chagami further stated that as of December of 2004, RFI was "insolvent."

Subsequently, on September 1, 2005, Petitioners filed an ex parte motion for issuance of execution and garnishment of the December 21, 2004 judgment against the assets of both RFI and HSC. In their memorandum in support of the motion, Petitioners asserted that the transfers were fraudulent under HRS §§ 651C–4(a)(1) (1993), 651C–4(a)(2) (1993), and HRS § 651C–5 (1993).[9] Accordingly, Petitioners asserted that they were entitled to execution and garnishment against the assets transferred under HRS § 651C–7(b) (1993). The court denied Petitioners' motion "without prejudice to filing a separate action against the proper parties."

### C.

On April 7, 2006, Petitioners filed a Complaint with the court against Respondents in Civ. No. 06–1–0611–04 that is the subject of the instant appeal. The Complaint alleged, *inter alia,* that the transfers were fraudulent and Petitioners were entitled to remedies under HRS § 651C–7.

The case proceeded to a bench trial on July 1 and 2, 2008. The parties submitted written closing arguments on July 31, 2008. In their closing argument, Petitioners asserted that the transfers violated HRS § 651C–4(a)(1) [10] because they were made with "[a]c-

---

8. The Honorable Karen N. Blondin, in the First Circuit Court, presided over the proceedings on remand.

9. HRS § 651C–5 establishes the circumstances under which a transfer by a debtor is fraudulent as to a present creditor. Petitioners did not file a

cause of action under HRS § 651C–5 in their Complaint.

10. HRS § 651C–4 provides in relevant part as follows:

tual intent to hinder, delay, or defraud Petitioners." Additionally, Petitioners asserted that their claims fell within the statute of limitations established by HRS § 651C–9(1).[11] In opposition, Respondents asserted that Petitioners "failed to prove actual intent clearly and convincingly," *see Kekona v. Abastillas*, 113 Hawai'i 174, 181–82, 150 P.3d 823, 830–31 (2006) (holding that the clear and convincing standard applies to UFTA fraudulent transfer claims), and that Petitioners' "claim was not timely filed."

On October 7, 2008, the court entered the following relevant findings of fact (findings), conclusions of law (conclusions), and Order:

### Findings of Fact

. . . .

5. This action relates to four allegedly fraudulent transfers by RFI: (a) a check payable to Defendant [Eleanor] dated February 11, 2000 in the amount of $78,000; (b) a check payable to [Goodsill] dated February 15, 2000 in the amount of $119,393.42; © a check payable to Defendant [Richard] dated February 11, 2000 in the amount of $54,399.55; and (d) a check payable to [Kamehameha Schools] in the amount of $165,058.42 from February 2000. . . .

6. The Transfers were made from the proceeds of a mortgage foreclosure sale which involved a transaction in which [Petitioners] were the mortgagors, and RFI, a subsidiary of HSC, was the mortgagee.

7. The foreclosure sale proceeds received by RFI were used for the Transfers. The Transfers were payable to creditors of HSC.

8. There were some suspicious circumstances regarding the Transfers:

a. HSC was the parent company of RFI. The Transfers were made to creditors of HSC in order to pay RFI's obligations to HSC;

b. they were made through a separate account apparently created to effectuate them;

c. they were made immediately after receipt of the proceeds of the foreclosure sale; and

d. [Petitioners] appealed the trial court's judgment, so, at the time of the Transfers, it was questionable whether RFI would prevail on appeal. In order for RFI to prevail on appeal, the appellate court

§ 651C–4 **Transfers fraudulent as to present and future creditors.**
(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
(b) In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider;
. . .
(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor was sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
. . .
(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
. . . .
(Emphases added.)

11. HRS § 651C–9 provides in relevant part as follows:

§ 651C–9 **Extinguishment of cause of action.** A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:
(1) Under section 651C–4(a)(1), within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;
. . . .
(Emphases added.)

would have to determine that it was appropriate to require [Petitioners] to, in effect, pay twice in order to obtain a release from the judgment received by RFI in the foreclosure action: once to the assignee of the judgment, and once to RFI itself.

9. These circumstances did not constitute clear and convincing evidence of any actual intent on the part of [Respondents] to hinder, delay, or defraud any creditors of RFI:

a. When the Transfers were made, there was no actual debt owed to the Plaintiffs by RFI.

b. There was no expert testimony demonstrating that the Transfers were in violation of generally accepted accounting practices.

c. At the time of the Transfers, there was no business need to retain cash for the benefit of [Petitioners] should [Petitioners] prevail upon appeal. The onus was on [Petitioners] to obtain a stay in order to maintain the status quo pending the appeal. This would have enabled them to have a fund available to recover from if they prevailed on appeal. [Petitioners] did not obtain such a stay.

d. At the time of the Transfers, RFI had bona fide debts owed to HSC and there was a legitimate business purpose in transferring RFI's assets to reduce those debts.

. . . .

f. RFI did not conceal the Transfers by, for example, not recording the Transfers in its accounting records or by entering into agreements with the transferees not to disclose the existence of the Transfers.

g. The Transfers did not render RFI insolvent at the time they were made.

h. RFI did not terminate its existence after the Transfers.

### Conclusions of Law

. . . .

5. Despite the facts reflecting in [findings] 8(a)–8(d), [Petitioners] did not prove by clear and convincing evidence that RFI

actually intended to hinder, delay, or defraud any creditors of RFI, as required by HRS § 651C–4(a)(1).

### Order of Dismissal

Based on the foregoing [findings and conclusions] . . . this action is to be dismissed and judgment is to be entered in favor of [Respondents] and against [Petitioners].

(Emphases added.) The court did not discuss Respondents' argument that Petitioners' claim was untimely under HRS § 651C–9(1).

Following the court's ruling in favor of Respondents, Respondents filed a Motion for Attorneys Fees and Costs on October 10, 2008. Petitioners filed an opposition memorandum. After Petitioners appealed to the ICA, on January 9, 2009, the court issued an "Order on [Respondents'] Motion for Attorneys Fees and Costs Filed on October 10, 2008, requesting that the matter be remanded to the court for . . . an order [ ] setting forth the . . . award of attorney's fees and costs." [12]

### II.

### A.

Petitioners appealed to the ICA on November 5, 2008. In their Opening Brief filed on March 19, 2009, Petitioners challenged the court's conclusion that Respondents did not intend to hinder, defraud, or delay Petitioners by transferring funds from RFI to HSC, and several findings supporting that conclusion. Respondents filed a cross-appeal on January 9, 2009. In their Opening Brief on cross-appeal, Respondents asserted that Petitioners' UFTA claim under HRS § 651C–4(a)(1) was time-barred. Respondents also argued in their cross-appeal that the court erroneously denied their request for attorneys' fees. The ICA did not discuss Petitioners' arguments that the court's findings and conclusions were erroneous. *See* discussion *infra.* Rather, the ICA ruled on the statute of limitations issue raised in the cross-appeal instead, holding that Petitioners' UFTA

---

**12.** Subsequently, Respondents filed two motions to temporarily remand the case to the court to allow the court to rule on the attorney's fees

issue. The ICA denied both motions without prejudice.

claim should have been dismissed as untimely.

### B.

In their cross-appeal, Respondents maintained that pursuant to HRS § 651C–9(1), "claims based upon [HRS § 651C–4(a)(1) must] be filed 'within four years after the transfer was made [in this case, in February, 2000] . . . or, if later, within one year after the transfer . . . was or could have been discovered by the claimant.[13]'" (Quoting HRS § 651C–9(1).) Here, Petitioners' claim was brought more than four years after the transfers were made in February, 2000. Therefore, according to Respondents, "[Petitioners'] claim was timely . . . only if [ ] they had no knowledge of the disputed transfers prior to April 8, 2005 [one year before Petitioners filed their Complaint] and [ ] they could not have discovered them before that date with reasonable diligence."

As to Petitioners' discovery of the disputed transfers, Respondents contended that under the discovery rule, "the only discovery necessary to trigger the running of the one-year discovery extension is <u>the discovery of the transfers themselves</u>." (Emphasis in original.) According to Respondents, Petitioners "became aware of the <u>existence</u> of the transfers . . . on March 18, 2005." (Emphasis in original.) Therefore, Respondents maintain, "[Petitioners'] claim expired on March 18, 2006," prior to the filing of Petitioners' Complaint on April 7, 2006.

Additionally, Respondents argued that Petitioners should have discovered evidence of the transfers "long before April 8, 2005," one year before Petitioners' Complaint was filed. According to Respondents, "after [this court] ruled in [Petitioners'] favor on March 18, 2004 . . . [Petitioners] had tools they could, and should have used to discover the disputed transfers[.]" However, Respondents maintain that Petitioners "delayed meaningfully seeking discovery into [Respondents] assets until March 2005[.]" Therefore Petitioners "have no one to blame but themselves for the extended delay in discovering their [ ] claim[.]"

### C.

In their Answering Brief on cross-appeal, Petitioners argued that the one year period in the discovery rule does not begin until the plaintiffs discover the "fraudulent nature" of the transfer. (Citing *Freitag v. McGhie*, 133 Wash.2d 816, 947 P.2d 1186 (1997).) Petitioners maintained that they "were not aware of the fraudulent transfers until as early as April 20, 2005." Hence, according to Petitioners the one year period did not begin until April 20, 2005 at the earliest, making their UFTA claim filed on April 7, 2006 timely.

They also contended that they did not initiate discovery earlier because "there was no judgment filed in the foreclosure actions regarding the surplus of the sale proceeds until December 21, 2004." Petitioners declared that following remand by this court, there was "extensive pleading" because Respondents "opposed the accounting action and forced [Petitioners] to make numerous pleadings to finally result in judgment in their favor." Petitioners explained that "at no time did RFI's counsel tell [Petitioners] that RFI was unable to pay any monetary judgment . . . over $1,500."

Also, Petitioners advanced several alternative theories as to why their claim was timely. They contended (1) that the ex parte motion filed for execution/and or garnishment filed on September 1, 2005, "could [also] be construed [ ] as a commencement of an action under HRS § 651C–9(1)," (2) that their claim was timely under HRS § 657–20 (1993),[14] which "extends the statute of limitations by fraudulent concealment," and (3) that "the statute of limitations of a UFTA claim starts when the creditor has a final judgment against the debtor, not on the date when the transfer was made[.]" (Citing *Cor-*

---

13. The section of HRS § 651C–9(1) allowing a plaintiff to bring an action under HRS § 651C–4(a)(1) within one year after the transfer could reasonably have been discovered by the claimant is referred to herein as the "discovery rule."

14. *See* HRS § 657–20, quoted *infra*.

*tez v. Vogt*, 52 Cal.App.4th 917, 60 Cal. Rptr.2d 841 (1997).)

In their Reply Brief, Respondents again argued that Petitioners' UFTA claim was untimely under the one year period set forth in HRS § 651C–9(1). Respondents asserted that they "did not fraudulently conceal the transfers," and that the holding in *Cortez* that the statute of limitations starts when a final judgment is entered "has now been rejected by virtually all jurisdictions."

### III.

The ICA agreed with Respondents' position that the one year period in HRS § 651C–9(1) begins on the date that the transfer was discovered, rather than on the date the plaintiff discovers "the fraudulent nature of the transfer." *Schmidt*, 2013 WL 4711524, at *4–5. The ICA recognized that among the other jurisdictions adopting the UFTA, "there is no uniformity in the interpretation" of provisions analogous to HRS § 651C–9(1). *Id.* at *5. However, "the [discovery rule] plainly, unambiguously, and explicitly extends the four year time limit to no later than one year after the transfer has been discovered (or reasonably should have been discovered)." *Id.* at *4 (emphasis in original).

"The term 'transfer' is specifically defined in HRS § 651C–9(1) to mean 'every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes a payment of money, a release, a lease, and the creation of a lien or encumbrance.'" *Id.* The ICA noted that if "the Hawai'i Legislature intended to require knowledge of the 'fraudulent nature' [of the transfer] to trigger the UFTA statute of limitations, it could have included such language in its statute, as Arizona's legislature has done, but it did not." *Id.* Therefore, the ICA reasoned that the "plain meaning" of HRS § 651C–9(1) required the one year period to begin on March 18, 2005, the date Petitioners discovered the existence of the transfers. *Id.* at *5.

Further, the ICA explained that "[i]t is uncontroverted that, on March 18, 2005, [Pe-titioners] received a Realty Finance bank account statement showing that the four checks ... were disbursed by Realty Finance[.]" *Id.* at *4. "Thus, on March 18, 2005, [Petitioners] discovered that the transfers occurred." *Id.* Consequently, the ICA concluded that "[Petitioners'] UFTA claim was extinguished no later than one year after their discovery of the transfers on March 18, 2005, and their April 7, 2006 complaint was untimely." *Id.* at *5.

As a result, the ICA did not discuss several arguments raised by the parties. First, the ICA held that because Petitioner's UFTA claim was extinguished by HRS § 651C–9(1), it "need not reach the merits of [Petitioners'] points of error contending that the [court] erred in [ ] rejecting their claims." *Id.* at *5. Second, the ICA held that it was "unnecessary to address [the] contention" that "the transfers could have been discovered" at an earlier date. *Id.* at *4 n. 7. Finally, the ICA did not discuss any of the alternative theories that Petitioners raised in support of their position that their claim was timely.

As to Respondents' argument that the court erred in denying their request for attorneys' fees, the ICA related that "Respondents' subsequent motions to [the ICA] for temporary remand to allow the [court] to rule on [Respondents'] Hawai'i Rules of Civil Procedure Rule 60 motion were denied without prejudice on February 10, 2009 and April 23, 2009." *Id.* at *5. Thus, "the [court] never entered an order determining the amount of attorneys fees and/or costs or the basis for such an award." *Id.* The ICA "conclude[d] that th[e] case should be remanded for the limited purpose of allowing the [court] to enter a ruling on the substance of [Respondents'] request for attorneys' fees and costs." *Id.* (citing *Life of the Land v. Ariyoshi*, 57 Haw. 249, 251, 553 P.2d 464, 466 (1976) (per curiam)). Ultimately, the ICA "affirm[ed] the [c]ourt's October 7, 2008 Final Judgment" and "remand[ed] th[e] case for a ruling on [Respondents'] request for attorneys' fees and costs." *Id.* at *6.

### IV.

In their Application, Petitioners ask: (1) "Whether the ICA ... [erred in] deciding

that Petitioners UFTA claim was barred by the one-year statute of limitations and [in] failing to decide that [the court's] decision erroneously decided that Petitioners' UFTA claim was not proven, and therefore, ... [denied] Petitioner's recovery[,]" and (2) "Whether the ICA ... [erred in] remanding the case for a decision on Respondents' request for attorneys' fees under HRS § 607–14 and recovery of costs, without deciding the merits of their attorney fee request." A Response was filed on October 31, 2013. A Reply was filed on November 7, 2013.

## V.

As to the initial part of the first question presented in their Application, Petitioners again argue that their UFTA claim was timely under four alternative theories. First, Petitioners maintain that the one year statute of limitations set forth in HRS § 651C–9(1) begins on the date the fraudulent nature of the transfer is discovered, rather than on the date the transfer itself is discovered. Second, Petitioners contend that "the ex parte motion ... for execution and/or garnishment ... could be construed as a commencement of an action under HRS § 651C–9." Third, Petitioners argue that under HRS § 657–20,[15] the statute of limitations is extended by six years due to fraudulent concealment. Fourth, Petitioners assert that limitations period set forth in HRS § 651C–9(1), which allows the defendants to file an HRS § 651C–4(a)(1) action "within four

**15.** HRS § 657–20 provides in relevant part as follows:

§ 657–20 **Extension by fraudulent concealment.**
If any person who is liable to any of the actions mentioned in this part or section 663–3, fraudulently conceals the existence of the cause of action or the identity of any person who is liable for the claim from the knowledge of the person entitled to bring the action, the action may be commenced at any time within six years after the person who is entitled to bring the same discovers or should have discovered, the existence of the cause of action or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.
(Emphases added.)

**16.** HRS § 651C–9 refers to "a fraudulent transfer or obligation." Pursuant to HRS § 651C–4, either a "transfer made" or an "obligation in-

years after the transfer was made" actually begins "when the judgment was final in the underlying action." (Citing *Cortez*, 52 Cal. App.4th at 917, 60 Cal.Rptr.2d 841.)

## VI.

### A.

Petitioners' first theory as to why their claim was timely is that the "discovery rule" does not begin until a plaintiff discovers the "fraudulent nature" of the transfer. To reiterate, under HRS § 651C–9(1), "a cause of action with respect to a fraudulent transfer [16] ... is extinguished unless action is brought," *inter alia*, "within one year after the transfer ... was discovered ... or could reasonably have been discovered by the claimant." (Emphasis added.)

Petitioners argue that "the effect of HRS § 651C–9 is to extinguish a cause of action for a fraudulent transfer, not just any transfer." (Emphasis in original.) According to Petitioners, the ICA's plain language analysis "reads the word fraudulent out of the first sentence of HRS § 651C–9." (Emphasis in original.) Petitioners also point out that several cases, including *United States v. Green*, 2007 WL 1748698 (S.D.Ohio June 15, 2007), and *Freitag*, "used the fraudulent nature of the transfer as commencing the statute of limitations." [17] (Emphasis in original.)

Petitioners maintain that their UFTA claim, filed on April 7, 2006, was timely because they "were not aware of the fraudulent

curred by a debtor" can be fraudulent. In this case, Petitioners are challenging the transfer of funds from RFI to HSC, and not an "obligation incurred" by RFI. Hence, the "obligation" language in HRS § 651C–9 is inapplicable to this case.

**17.** Apparently as a part of the same argument, Petitioners cite *Hays v. City and County of Honolulu*, 81 Hawai'i 391, 917 P.2d 718 (1996), *Anderson v. State*, 88 Hawai'i 241, 965 P.2d 783 (App.1998), *Blair v. Ing*, 95 Hawai'i 247, 21 P.3d 452 (2001), and *Vidinha v. Miyaki*, 112 Hawai'i 336, 145 P.3d 879 (2006), for the proposition that Petitioners' "UFTA claim accrued when they discovered or through reasonable diligence should have discovered the damage, the fraudulent nature of the transfers, and the causal connection between the duty and the damage[.]"

transfers until as early as April 20, 2005," when they received copies of the checks used in the transfers and discovered that the transfers were not made "to proper creditors of RFI." According to Petitioners, they did not discover "the damage [they suffered] . . . until the Chagami deposition on July 26, 2005," when "for the first time they were informed that RFI was unable to pay the judgment."

### B.

On the other hand, in their Response, Respondents argue that "the ICA's reading of HRS § 651C–9(1) was correct" because "the plain language [of HRS § 651C–9] directs" that claims are extinguished "one year after a creditor discovers the disputed transfers." Further, Respondents contend that the Hawaiʻi legislature has not "chosen to modify [HRS § 651C–9(1)]" with "language that says the repose period starts after the fraudulent character of a transfer is first revealed[.]" Hence, Respondents declare that this court should not add to HRS § 651C–9(1) "unwritten requirements that the Hawaiʻi legislature omitted."

Additionally, Respondents relate that under HRS § 1–24, "Hawaiʻi courts [must] promote uniformity in the interpretation of uniform laws." According to Respondents, "most jurisdictions that have adopted Hawaiʻi's version of the [UFTA]" have held that the one year period in HRS § 651C–9(1) begins on the date that plaintiffs discovered the transfer, and not its fraudulent nature. Respondents attached, as an appendix to their Response, a table of other states that adopted the same statute of limitations under the UFTA. In the appendix, Respondents relate that twenty-eight other states have concluded that the one year discovery period begins when the transfer itself is discovered. Respondents assert that, contrastingly, only two jurisdictions have held that the one year period begins when the plaintiff discovers the fraudulent nature of the transfer.

Finally, Respondents argue that even if this court interprets the one year period as beginning when Petitioners' knew or should have known of the fraudulent nature of the transfers, Petitioners' claim is still time-barred because Petitioners were "dilatory in efforts to discover[ ] both the transfer and the alleged evidence of [Respondents'] actual intent." According to Respondents, therefore, Petitioners should have known of the fraudulent nature of the transfers more than a year before their Complaint was filed on April 8, 2006.

In their Reply, Petitioners counter that the cases cited in the appendix are not persuasive, because many of the cases are either federal or state trial court decisions, and not state appellate court decisions. Petitioners also relate that many of the cases cited by Respondents actually do not support the position that the one year period begins to run when the transfers themselves are discovered.

### VII.

Initially, it must be observed that the court did not discuss the statute of limitations in its findings and conclusions and therefore did not issue any findings or conclusions regarding when Petitioners discovered the "fraudulent nature" of the transfers. Similarly, the ICA did not discuss the date Petitioners' discovered the "fraudulent nature" of the transfers.

### A.

As explained by the Hawaiʻi federal bankruptcy court, "[s]ome courts read the [HRS § 651C–9(1)] statute literally and hold that the period begins to run as soon as a creditor discovered or reasonably could have discovered the transfer, even if no one knew the transfer was fraudulent." *In re Maui Indus. Loan & Fin. Co.*, 454 B.R. 133, 137 (Bankr.D.Hawaiʻi 2011). However, other jurisdictions "have held that the one year period does not begin to run until the fraudulent nature of the transfer is discovered or reasonably discoverable." *Id.* The Hawaiʻi bankruptcy court adopted the second view, predicting that "the Hawaiʻi state courts [will] follow the [ ] rule which is more protective of innocent creditors." *Id.*

### B.

■ Both the language of HRS § 651C–9(1) and the underlying purpose of the UFTA suggest that the one year period begins when a plaintiff discovers the fraudulent nature of a potential transfer. Those courts holding that the one year period begins once the plaintiff discovers the transfer itself claim to generally rely on "the actual language used in the statute." *In re Hill*, 2004 WL 5694988, at *3 (M.D.Fla. Nov. 4, 2004) (internal quotation marks omitted). In *Hill*, the federal district court interpreting Florida's UFTA statute noted the one year period begins following the discovery of the "transfer," and not "the fraudulent nature of the transfer." *Id.* According to that court, "[i]f the Florida legislature meant for actions brought within one year of when the 'fraudulent nature of the transfer' was or could reasonably have been discovered by the claimant to be timely, it could have so provided in the savings clause." *Id.* The federal district court noted that the Arizona legislature had amended its UFTA provision to read "within one year after the fraudulent nature of the transfer was [discovered.]" *Id. Hill*, therefore, interpreted the UFTA limitations provision as barring all actions not "brought within one year after the alleged transfers were or could reasonably have been discovered[.]" *Id.* (internal quotation marks omitted).

On the other hand, it has been asserted that "[c]ommon sense and the statutory purpose of the UFTA necessitate a finding that the statute begins to run with the discovery of the fraudulent nature of the conveyance." *Freitag*, 947 P.2d at 1189. In *Freitag*, the Washington Supreme Court explained that the "UFTA, obviously, discourage[s] fraud." *Id.* Therefore, to rule that the one year period began at the date of the transfer "would be to rule in complete derogation of the UFTA[.]" *Id.* at 1190.

Moreover, "[i]f the statute were to begin to run when the transfer was made, without regard as to whether the claimant discovered or could have discovered the fraudulent nature of the transfer, those successful at concealing a fraudulent transfer would be rewarded." *Id.* "The statute should not reward a person for successful concealment of fraud." *Id.* Hence, the Washington Supreme Court held that the UFTA limitation statute "provides a one-year period from the date of discovery of the fraudulent nature of the transfer within which to initiate a claim[.]" *Id.*

■ The interpretation of the UFTA limitations provision advanced in *Freitag* is consistent with our statute. First, HRS § 651C–9 begins by stating "[a] cause of action with respect to a <u>fraudulent</u> transfer or obligation is extinguished unless action is brought [within the relevant period]." (Emphasis added.) Next, HRS § 651C–9(1) provides that, for actions brought under HRS § 651C–4(a)(1), such as the action in this case, the limitations period extends until "one year after the transfer ... was or could reasonably have been discovered[.]" The term "transfer" in HRS § 651C–9(1) clearly refers to the "fraudulent transfer" identified in the preceding sentence. "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." *State v. Kamana'o*, 118 Hawai'i 210, 218, 188 P.3d 724, 732 (2008) (citations and internal quotations marks omitted). Hence, when HRS § 651C–9(1) is construed <u>in pari materia</u> with the introductory sentence in HRS § 651C–9, it is plain that the limitations period extends until one year after the <u>fraudulent</u> transfer was discovered. Thus, the limitations period begins when the plaintiffs discover that a <u>fraudulent transfer,</u> and not simply a transfer, occurred.

Additionally, it has been explained that in interpreting statutes, this court "must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose." *Blaisdell v. Dep't of Pub. Safety*, 113 Hawai'i 315, 318, 151 P.3d 796, 799 (2007) (internal quotation marks omitted). As explained by the Washington Supreme Court, the obvious purpose of the UFTA is to prevent fraud and to provide a remedy to those who are victims of fraudulent transfers. *See Freitag*, 947 P.2d at 1189. In the context of the entire statute, the discovery rule allows plaintiffs to pre-

serve fraud claims when they could not have discovered the existence of those claims prior to the expiration of the statute of limitations. This purpose would be undermined if the one year period began once plaintiffs discovered the existence of a transfer, even if they were unaware of its fraudulent nature. Under that interpretation, plaintiffs would lose the right to pursue a remedy in court for fraudulently incurred injuries even though they could not have become aware of the existence of their claims.

Finally, "[t]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." *Kim v. Contractors License Bd.*, 88 Hawai'i 264, 270, 965 P.2d 806, 812 (1998). Therefore, "[d]eparture from the literal construction of a statute is justified" if "such a construction yields an absurd and unjust result obviously inconsistent with the purposes and polices of the statute." *Leslie v. Bd. of Appeals of Cnty. of Hawai'i*, 109 Hawai'i 384, 393, 126 P.3d 1071, 1080 (2006) (internal quotation marks omitted). Here, it would be legally absurd and unjust to interpret the discovery rule to preclude claims under the UFTA if plaintiffs were never aware they held a potential claim. Additionally, as explained in *Freitag*, such an interpretation would produce the result of rewarding those "successful at concealing a fraudulent transfer." 947 P.2d at 1189.

In sum, interpreting the discovery rule as allowing plaintiffs to file an action within one year of the discovery of the "fraudulent nature" of a transfer, rather than of the transfer itself, is consistent with the statutory language referring to the transfer as a "fraudulent transfer." Additionally, this interpretation is consonant with the statutory purpose of preventing fraud. Finally, such an interpretation promotes the specific purpose of the discovery rule within the statutory context, i.e., allowing plaintiffs to pursue otherwise untimely claims after discovering their existence. Hence, under HRS § 651C–9(1), Petitioners could bring their HRS § 651C–4(a)(1) claim within a year after discovering the "fraudulent nature" of the transfer from RFI to MSC.

### C.

Respondents' contention that this court must interpret the one year period in HRS § 651C–9(1) as beginning from the date the plaintiffs discover the transfer itself to promote uniformity with other jurisdictions interpretations of the UFTA is incorrect. Respondents' appendix purportedly demonstrating that twenty-eight other jurisdictions have held that the one year period begins when the transfer was discovered is inaccurate.

First, the cases from many of the jurisdictions cited in the appendix do not discuss the one year "discovery rule" at all. Many of the cases cited in Respondents' appendix discuss the four year period, <u>not</u> the one year "discovery rule." [18] Additionally, some of the cases cited in Respondents' appendix do not concern the UFTA extinguishment provision requiring that the fraudulent transfer action must be brought either within four years of the date the transfer was made or within one year of the date the transfer was discovered, whichever was later.[19] Thus, none of these

---

18. *See, e.g., In re S. Health Care of Arkansas, Inc.*, 299 B.R. 918 (Bankr.E.D.Ark.2003); *Sands v. New Age Family P'ship, Ltd.*, 897 P.2d 917 (Colo. Ct.App.1995); *Steinberg v. A Analyst Ltd.*, 2009 WL 806780 (S.D.Fla.2009); *Kent v. White*, 279 Ga.App. 563, 631 S.E.2d 782 (2006); *Marwil v. Cluff*, 2007 WL 2608845 (S.D.Ind.2007); *In re Schaefer*, 331 B.R. 401 (Bankr.N.D.Iowa 2005); *In re Mi–Lor Corp.*, 233 B.R. 608, 616 (Bankr. D.Mass.1999); *In re Nat'l Audit Defense Network*, 367 B.R. 207 (Bankr.D.Nev.2007); *SASCO 1997 NI, LLC v. Zudkewich*, 166 N.J. 579, 767 A.2d 469 (2001); *Anderson v. Godley*, 2009 WL 2881080 (W.D.N.C. Sept. 8, 2009); *In re Sun Valley Products, Inc.*, 328 B.R. 147, 156 (Bankr. D.N.D.2005); *In re C.F. Foods, L.P.*, 280 B.R. 103, 112 (Bankr.E.D.Pa.2002); *In re Supplement Spot, LLC*, 409 B.R. 187, 201 (Bankr.S.D.Tex. 2009); *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 677 (S.D.Tex.2007); *cf. Selvage v. J.J. Johnson & Associates*, 910 P.2d 1252, 1258 (Utah Ct.App.1996) (discussing a different type of UFTA action not subject to the Utah equivalent of HRS § 651C–9(1)).

19. *See, e.g., McWilliams v. McWilliams*, 970 So.2d 200, 203 (Miss.Ct.App.2007) (interpreting the general Mississippi statute of limitations, rather than the UFTA statute of limitations); *Gibson v. Trant*, 58 S.W.3d 103, 117 (Tenn.2001) (resolving a medical malpractice claim, not a

cases examine the issue of when a transfer was "discovered" under the UFTA limitations statute. These cases are thus irrelevant to the question of when a transfer is "discovered" under HRS § 651C–9(1).

In several of the cases cited by Respondents, the court did hold that the one year period began when the plaintiffs discovered the transfer itself. However, in those cases, the plaintiffs did not raise the argument that the one year period did not begin until they discovered the "fraudulent nature" of the transfer.[20] Hence, none of those courts analyzed the issue of when the one year period begins.

Finally, some of the cases cited by Respondents actually appear to interpret the one year discovery period as beginning on the date the "fraudulent nature" of the transfer was discovered. For example, in *Norwood Grp., Inc. v. Phillips*, 149 N.H. 722, 828 A.2d 300 (2003), the New Hampshire Supreme Court held that the plaintiffs' claims did not fall within the one year discovery rule because the claims were brought "more than one year after the plaintiffs discovered that the sale was allegedly fraudulent." *Id.* at 304 (emphasis added). Similarly, in *Salisbury v. Majesky*, 352 Ill.App.3d 1188, 288 Ill.Dec. 569, 817 N.E.2d 1219 (2004), the Appellate Court of Illinois, Third District, stated that the discovery period began when the plaintiff "should have reasonably known, at the very least, that a possible cause of action may have existed for fraudulent transfer."

*Id.* at 1223. Moreover, Respondents omit several cases that begin the one year discovery period when the plaintiffs could have discovered the fraudulent nature of the transfers.[21]

In total, the cases cited in Respondents' appendix do not support Respondents' contention that "most jurisdictions" have adopted the ICA's interpretation of HRS § 651C–9(1). Instead based on the foregoing, it is evident that as the ICA concluded, "there is no uniformity in the interpretation of the 'extinguishment' provision." *Schmidt*, 2013 WL 4711524, at *5. As noted, of those courts that actually considered the issue, some courts have concluded that, based on the plain language of the statute, the limitations period begins at the date of the transfer itself. *In re Hill*, 2004 WL 5694988, at *3; *see also In re Spitaleri*, 2006 WL 4458357, at *2 (Bankr.N.D.Ohio May 9, 2006). Yet, other courts have concluded that based on the statutory purpose, the limitations period begins on the date the fraudulent nature of the transfer is discovered. *Freitag*, 947 P.2d at 1189; *Hu v. Wang*, 2009 WL 1919367, at *6 (Cal.Ct.App. July 6, 2009) (unpublished). Also, as discussed *supra*, one or the other position has been adopted by several jurisdictions without analysis.

In *Cnty. of Hawai'i v. UniDev, LLC*, 129 Hawai'i 378, 301 P.3d 588 (2013), this court concluded that the mandate in HRS § 1–24 that uniform acts "shall be so interpreted

---

UFTA claim, under the general Tennessee statute of limitations); *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680 (Tenn.1990) (discussing a products liability action, rather than a UFTA claim); *cf. In re Heaper*, 214 B.R. 576, 583 (8th Cir. BAP 1997) (holding that the Missouri UFTA did not apply because the transfer occurred prior to the date Missouri enacted the UFTA).

20. *See, e.g., Cendant Corp. v. Shelton*, 473 F.Supp.2d 307 (D.Conn.2007); *Joslin v. Grossman*, 107 F.Supp.2d 150 (D.Conn.2000); *Pereyron v. Leon Constantin Consulting, Inc.*, 2004 WL 1043724 (Del.Ch.2004); *Gulf Ins. Co. v. Clark*, 304 Mont. 264, 20 P.3d 780, 783 (2001); *Intili v. DiGiorgio*, 300 N.J.Super. 652, 660, 693 A.2d 573, 577 (Ch.Div.1997); *In re Ewbank*, 359 B.R. 807, 810 (Bankr.D.N.M.2007); *Duffy v. Dwyer*, 847 A.2d 266 (R.I.2004); *Supreme Bakery, Inc. v. Bagley*, 742 A.2d 1202 (R.I.2000); *Duran v. Henderson*, 71 S.W.3d 833 (Tex.Ct.App.2002);

*Blesh v. Johnson*, 2006 WL 5838212 (Vt.2006); *Sandhill Oil Co., Inc. v. Ross*, 2001 WL 34034445 (Neb.Dist.Ct.2001) (trial court decision).

21. *See, e.g., Johnston v. Crook*, 93 S.W.3d 263, 271–72 (Tex.App.2002) ("Because the 272 warranty deed did not conclusively establish when Receiver knew or should have known about the allegedly fraudulent transfer of the house, Crook's summary judgment proof did not conclusively establish limitations had run on Receiver's challenge to that transfer." (emphasis added)); *Gilbert Bros., Inc. v. Gilbert*, 258 Ill.App.3d 395, 196 Ill.Dec. 492, 630 N.E.2d 189, 192 (1994) ("[T]he statute starts to run when a person knows or reasonably should know of his injury and that it was wrongfully caused." (emphasis added)); *In re G–I Holdings, Inc.*, 313 B.R. 612, 641 (Bankr.D.N.J.2004); *Fidelity Nat'l Title Ins. Co. v. Howard Savings Bank*, 436 F.3d 836 (7th Cir.2006) (interpreting Illinois law).

and construed as to effectuate their general purpose to make uniform the laws of the states and territories which enact them," HRS § 1–24, did not apply in the face of "conflicting interpretations of the [uniform acts] ... in other states." *UniDev*, 129 Hawai'i at 393, 301 P.3d at 603. As explained previously, the other states to interpret the UFTA have not construed the extinguishment provision in a uniform manner. Hence, HRS § 1–24 is not controlling here.

## VIII.

Based on the foregoing, the one year statute of limitations period begins on the date the fraudulent nature of the transfer "was or could reasonably have been discovered by the claimant." HRS § 651C–9(1). The ICA incorrectly held that the statute of limitations runs from the date of the transfer, rather than the date that Petitioners discovered the fraudulent nature of the transfer. Hence, the ICA's October 9, 2013 judgment must be vacated.

## IX.

As to Petitioners' second alternative theory, Petitioners contend that the ex parte motion for execution and/or garnishment filed on September 1, 2005 could be construed as the "commencement of an action under HRS § 651C–9." However, Petitioners cite to no legal authority in support of this conclusory statement. No argument is presented as to <u>why</u> filing the ex parte motion in a different proceeding could be construed as a commencement of the present action. Hence, it is not necessary to discuss this argument further. *See Norton v. Admin. Dir. of the Court,* 80 Hawai'i 197, 200, 908 P.2d 545, 548 (1995) (stating that this court may "disregard [a] particular contention," if

the Petitioner "makes no discernable argument in support of that position"); *see also Aames Funding Corp. v. Mores,* 107 Hawai'i 95, 104, 110 P.3d 1042, 1051 (2005) ("Because the Moreses do not provide any discernible legal argument as to their contention ... we do not address this contention further.").

## X.

As to Petitioners' third alternative theory, Petitioners maintain that "under HRS § 651C–10, the law of fraud discovery applies." HRS § 651C–10 [22] states that "unless displaced by the provisions of [the UFTA], the principles of law ... relating to ... fraud ... supplement its provisions." Petitioners apparently characterize HRS § 657–20, which extends the statute of limitations by six years if a potential defendant fraudulently conceals the existence of a cause of action, as a principle of law "relating to fraud" and therefore contend that "HRS § 657–20 applies to the UFTA claim per HRS § 651C–10." Petitioners rely on two federal district court cases, *Rundgren v. Bank of New York Mellon,* 777 F.Supp.2d 1224 (D.Haw.2011) (Seabright, J.) and *Balog v. Center Art Gallery–Hawai'i,* 745 F.Supp. 1556, 1572–73 (D.Haw.1990) (Ezra, J.), that applied the doctrine of fraudulent concealment in non-UFTA cases. According to Petitioners, HRS § 657–20 and the doctrine of fraudulent concealment applies to UFTA claims generally. However, Petitioners do not provide any definition of "fraudulent concealment" and therefore do not explain why the facts of this case constitute fraudulent concealment under any controlling legal standard. Petitioners therefore do not make any discernable argument as to why the doctrine of fraudulent concealment should apply to the facts of this case. Thus, we need not decide this issue.[23]

---

**22.** HRS § 651C–10 provides as follows:

> **§ 651C–10   Supplement of provisions.**
> Unless displaced by the provisions of this chapter, <u>the principles of law and equity,</u> including the law merchant and <u>the law relating</u> to principal and agent, estoppel, laches, <u>fraud,</u> misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, <u>supplement its provisions.</u>

(Emphases added.)

**23.** In their Application, Petitioners state that "on September 7, 2005, Schmidts' counsel wrote a demand letter to the Defendant shown in Exhibit 84 but there was no response." Petitioners further contend that "the undisputed facts are that RFI, by and through [Respondents], were concealing RFI's financial condition and the 'upstream' transfer of RFI's assets to [Respondents]. Such conduct tolls the statute of limitations." However, Petitioners do not cite any authority for this proposition, or cite any cases that explain

## XI.

■ Fourth, Petitioners assert that under *Cortez*, "the [four year] statute of limitations on an UFTA claim starts when the creditor has a final judgment against the debtor, not on the date the transfer was made." To reiterate, HRS § 651C–9(1) sets forth two alternate limitations periods for actions brought under HRS § 651C–9(1), either "within four years after the transfer was made," or "if later, within one year after the transfer or obligation was or could have reasonably been discovered by the claimant." As explained *supra*, the second limitations period allows plaintiffs to file suit even if they could not have discovered the existence of their cause of action within the four year period.

Petitioners' first theory was that their UFTA claim was timely under the second prong of the statute, i.e., the one year "discovery rule." Under their alternate theory, Petitioners take the position that their claim was also timely under the first prong of HRS § 651C–9(1) because, as in *Cortez*, their claim was brought within four years of the final judgment in the underlying action between Petitioners and RFI.

In *Cortez*, the California Court of Appeals observed that the UFTA statute of limitations section stated that it began at "the time the transfer was made." 52 Cal.App.4th at 929, 60 Cal.Rptr.2d 841. Nevertheless, *Cortez* determined that, based on prior California law, "where there is an alleged fraudulent transfer made during a pending lawsuit that will establish where in fact, and the extent to which, a debtor-creditor relationship exists ... the [four year] limitation period does not commence to run until the judgment in the underlying action becomes final." *Id.* at 937, 60 Cal.Rptr.2d 841.

Numerous courts have explained that the decision in *Cortez* is contrary to the plain language of the UFTA limitations provision stating that the four year statute of limitations begins "within four years after the transfer was made[.]" (Emphasis added.) That language "clearly indicates that an action ... must be brought within four years of the date the transfer was made." *Levy v. Markal Sales Corp.*, 311 Ill.App.3d 552, 244 Ill.Dec. 120, 724 N.E.2d 1008, 1012 (2000). Consequently, "the explicit language provides that the four-year provision runs from the date of transfer rather than the date of judgment." *SASCO*, 767 A.2d at 473. Thus, Petitioners' contention that the four year limitations period began when the judgment was filed in the underlying action is contradicted by the language of the statute.[24]

*Cortez* explained that if a creditor asserts that a transfer was fraudulently made by a debtor to escape potential liability in another suit, the creditor may be required to file a second action based on the fraudulent transfer before the initial suit is concluded in order to meet the four year deadline. *Cortez*, 52 Cal.App.4th at 932, 60 Cal.Rptr.2d 841. If the creditor subsequently fails in the initial action, then both the underlying action and the fraudulent transfer claim would be dismissed, and the actions "will have resulted in needless effort and expense to both parties and the court." *Id.* The California Court of Appeals further noted that the Minnesota Supreme Court had used similar reasoning when interpreting the Uniform Fraudulent Conveyance Act (UFCA), the predecessor to the UFTA. *Lind v. O. N. Johnson*, 204 Minn. 30, 282 N.W. 661, 667–68 (1938).

However, Petitioners point to nothing indicating our legislature intended to deviate from the plain language of the statute providing that the limitations period begins on the

---

when the doctrine of fraudulent concealment applies in these circumstances.

**24.** *See, e.g., Levy,* 244 Ill.Dec. 120, 724 N.E.2d at 1012 ("We are not convinced by the *Cortez* analysis."); *SASCO* 767 A.2d at 473 (rejecting *Cortez*); *Clark,* 20 P.3d at 786 ("[W]e join other jurisdictions which have criticized the ultimate determination of the California court in *Cortez.*"); *Moore v. Browning,* 203 Ariz. 102, 50 P.3d 852, 860 (Ariz.Ct.App.2002) ("Unlike the court in *Cortez,*

we are unable to discern ... any intent to toll the statute of repose until a judgment is filed."); *K–B Bldg. Co. v. Sheesley Const., Inc.,* 833 A.2d 1132, 1136 (Pa.Sup.Ct.2003) ("*Cortez* has been roundly criticized and is against the weight of authority in this area."); *cf. Supreme Bakery, Inc. v. Bagley,* 742 A.2d 1202, 1205 (R.I.2005) (holding that the four year limitations period begins on the date of the transfer).

date of the transfer, rather than the underlying judgment, based on such concerns.[25] *See Levy,* 244 Ill.Dec. 120, 724 N.E.2d at 1013 (noting "the concerns expressed by [*Cortez*] regarding the potential of needless litigation," but holding that "the [UFTA] plainly contemplates that such provisional litigation may be necessary under certain circumstances"). Hence, Petitioners' argument that the statute of limitations began to run when the judgment in the underlying action was filed is incorrect.

## XII.

Based on the foregoing, the ICA incorrectly held that the statute of limitations runs from the date of the transfer, rather than from the date that Petitioners' discovered the fraudulent nature of the transfer. The ICA also did not decide the merits of the case, as requested by Petitioners in their Opening Brief on appeal.

In the second part of the first question in their Application, Petitioners state that "the ICA's authorities do not support ... the refusal to decide [Petitioners'] appeal issues[.]" In their Response, Respondents asserted that "[t]he Petition for Certiorari should be rejected" but did not discuss the proper disposition of the case should this court overrule the ICA on the statute of limitations issue. Finally, in their Reply, Petitioners again maintained that they "ha[d] shown conclusively that the trial court committed several significant reversible errors," but that "[t]he ICA did not even address Petitioners' points of error and arguments[.]"

Here, the ICA's decision on the statute of limitations provision in HRS § 651C–9(1) was wrong as a matter of law. We therefore vacate its ruling on that issue and remand that issue to the ICA. Additionally, we remand the case to the ICA for a ruling on the merits of the case, as raised in Petitioners' appeal herein from the October 7, 2008 judgment, irrespective of its decision on the stat-

ute of limitations issue on remand. *See Hamilton ex rel. Lethem v. Lethem,* 119 Hawai'i 1, 12, 193 P.3d 839, 850 (2008)(holding that the ICA incorrectly ruled that the case was moot and therefore "remand[ing] the case to the ICA with instructions to address the merits of Father's case"); *Bocalbos v. Kapiolani Med. Ctr. for Women & Children,* 89 Hawai'i 436, 443, 974 P.2d 1026, 1033 (1999) (vacating the ICA's opinion dismissing an appeal for lack of jurisdiction and "remand[ing] the appeal to the ICA for a decision on the merits"); *Abadilla v. Iwata,* SCWC–29851, 2013 WL 4458874, at *11; *see also* HRS § 602–5 (allowing this court to "do such acts" that are "necessary to carry into full effect the powers which are or shall be given to it by law or for the promotion of justice in matters pending before it").

Finally, as to the second question presented in their Application, the ICA's judgment remanded the case to the court for a determination of whether Respondents were entitled to attorneys' fees. A determination of whether Respondents are entitled to attorneys' fees cannot be made in light of our disposition on the first question inasmuch as the prevailing party must be determined on remand. Consequently, the ICA's judgment as to this issue is also vacated and remanded.

## XIII.

Based on the foregoing, the October 9, 2013 judgment of the ICA is vacated and the case remanded to the ICA for proceedings consistent with this opinion.

**25.** *Cortez* maintains that the commentary to Section 7 of the UFTA cites *Lind* with approval. However, Section 7 enumerates the potential remedies available in UFTA actions. Section 7, therefore, has nothing to do with the statute of limitations set forth in Section 9.

The commentary to Section 7 cites *Lind* for the proposition that "the remedies specified in [Section 7] ... are cumulative." 7A Uniform Laws Annotated, Part II at 157. Thus, the citation to *Lind* in the Commentary does not pertain to the date the statute of limitations begins to run.