**Electronically Filed
Intermediate Court of Appeals
29454
31-AUG-2015
11:26 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

THOMAS FRANK SCHMIDT and LORINNA JHINCIL SCHMIDT,
Plaintiffs-Appellants and Cross-Appellees, v. HSC, INC.,
a Hawai'i corporation; RICHARD HENDERSON, SR.; ELEANOR R.J.
HENDERSON; JOHN DOES 1 through 10; JANE DOES 1 through 10;
and DOE UNINCORPORATED ASSOCIATIONS, INCLUDING PARTNERSHIPS
1 through 10, Defendants-Appellees and Cross-Appellants

NOS. 29454 and 29589

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 06-1-228)

AUGUST 31, 2015

FUJISE, PRESIDING JUDGE, LEONARD AND GINOZA, JJ.

OPINION OF THE COURT BY LEONARD, J.

This case is revisited by the Intermediate Court of
Appeals (**ICA**) on remand from the Hawai'i Supreme Court.

Plaintiffs-Appellants Thomas Frank Schmidt and Lorinna
Jhincil Schmidt (the **Schmidts**) appeal from an October 7, 2008
Final Judgment entered by the Circuit Court of the Third Circuit

(**Circuit Court**)[1] in favor of Defendants-Appellees HSC, Inc. (**HSC**), Richard Henderson, Sr. (**Richard**), and Eleanor R.J. Henderson (**Eleanor**) (Richard and Eleanor are referred to as the **Hendersons**) (collectively, HSC, Richard, and Eleanor are referred to as **Appellees**) and against the Schmidts. The Schmidts argue on appeal that the Circuit Court erred when it dismissed their fraudulent transfers claims against Appellees. Appellees argue on cross-appeal that the Circuit Court erred when it concluded that the Schmidts' claims were not time-barred and when it failed to timely award Appellees their attorneys' fees and costs.

I.    BACKGROUND

    A.    The Foreclosure Action

        This case stems from a foreclosure action called _Realty Finance, Inc. v. Schmidt_, which is chronicled in a Hawaiʻi Supreme Court Memorandum Opinion (No. 23441) dated March 18, 2004. _Realty Finance, Inc. v. Schmidt_ (**Realty II**), No. 23441, 2004 WL 541878 (Haw. Mar. 18, 2004) (mem.). Relevant highlights are as follows.[2]

        In 1991 and 1995, the Schmidts executed and delivered various promissory notes and mortgages that were later assigned to Realty Finance, Inc. (**Realty Finance**).[3] The Schmidts subsequently defaulted on the notes and mortgages and Realty

_____

[1]    The Honorable Greg K. Nakamura presided.

[2]    The supreme court's Memorandum Opinion is accessible at http://www.state.hi.us/jud/23441mop.htm. Additional facts are stated in a preceding ICA Memorandum Opinion, which was reversed by the supreme court's Memorandum Opinion, which rejected the ICA's legal analysis and conclusion, but not its statement of the facts. The ICA's Memorandum Opinion, dated June 27, 2002, is accessible at http://www.state.hi.us/jud/ica23441mop2.htm#N_16_.

[3]    Realty Finance is not a party to this present action.

Finance filed a foreclosure action against the Schmidts. On February 24, 1998, a motion for an interlocutory decree of foreclosure was granted, the amount of the Schmidts' debt to Realty Finance was determined, and a judgment was entered. Thereafter, Realty Finance sold the Schmidts' notes and mortgages to another entity, Waikiki Investments 418, Inc. (**Waikiki Investments**), pursuant to various agreements that, *inter alia*, allowed Waikiki Investments to collect the sums due on the notes and mortgages.

In June of 1999, Waikiki Investments collected a total of $309,000 from Amerasian Land Co. (**Amerasian**)[4] and $225,000 from Lulani Properties, LLC (**Lulani**), which were intended to secure a release of the mortgages encumbering the mortgaged properties. Waikiki Investments then defaulted on its agreement with Realty Finance. In July of 1999, Realty Finance filed a notice stating that it was again the real-party-in-interest and it "revived" the foreclosure proceedings. After various further proceedings in the Circuit Court and the ICA, which were unfavorable to the Schmidts, on March 18, 2004, the Hawai'i Supreme Court held: (1) that the Schmidts' notes and mortgages merged into the February 24, 1998 judgment; (2) thus, Realty Finance in effect assigned the right to proceeds under the judgment to Waikiki Investments; (3) when Amerasian and Lulani paid Waikiki Investments, they paid the debts identified in the February 24, 1998 judgment and, accordingly, paid down the

---

[4]     Thomas Schmidt is identified as the vice-president of Amerasian.

judgment; and (4) therefore, the mortgage debts owed by the Schmidts were reduced by the payments made by Amerasian and Lulani to Waikiki Investments. See Realty II, mem. op. at 19-20. In essence, the supreme court agreed with Amerasian and the Schmidts' argument that it was wrong to require them to pay over $1,000,000 for a $564,000 judgment and to entitle Realty Finance and its assignees to collect over $1,000,000 on a $564,000 judgment. The case was remanded, *inter alia*, for an appropriate accounting and further proceedings consistent with the supreme court's decision. The result was a December 21, 2004 final judgment, in the total sum of $537,258.66, entered in favor of the Schmidts and against Realty Finance.

B.     The Realty Finance Transfers

In the meantime, prior to the supreme court's ruling, and after Realty Finance reasserted its interest in the foreclosure proceedings, Realty Finance sought and was granted approval of a private sale of the mortgaged properties. Pursuant to an order entered in the foreclosure proceedings on January 31, 2000, the foreclosure commissioner distributed the sales proceeds to Realty Finance over the Schmidts' objections. Prior to a series of judgments "finalizing" the orders confirming the private sales, approving the distribution of the sales proceeds, and entering a deficiency judgment against the Schmidts, dated April 11, 2000, May 10, 2000, and June 9, 2000, respectively, Realty Finance used the sales proceeds for the benefit of its

4

parent corporation, HSC.[5] More specifically, Realty Finance directed payment to four of HSC's "creditors" as follows: (1) a February 11, 2000 check payable to Richard in the amount of $54,339.55; (2) a February 11, 2000 check payable to Eleanor in the sum of $78,000.00; (3) a February 15, 2000 check payable to Goodsill, Anderson, Quinn and Stifel (**Goodsill**) in the amount of $119,393.42; and (4) a March 1, 2000 check payable to Kamehameha Schools-Bernice Pauahi Bishop Estate (**Kamehameha Schools**) in the amount of $165,058.42.

C.    The Schmidts' Discovery of the Transfers

The Schmidts became aware of the above-referenced transfers on March 18, 2005, at the latest. On April 12, 2005, the Schmidts' attorney wrote to Appellees' attorney:

> On March 18, 2005 we met with you at your offices, wherein, in response to our document request, you produced documents on behalf of Realty Finance. One of the documents that you produced[] was the Realty Finance monthly bank statement for February, 2000 at American Savings Bank. Said monthly statement shows a deposit of $487,036.74 to Realty's account, which we surmise to be the payment from the foreclosure commissioner (Mr. Lau) of the proceeds due Realty from the sale of the Schmidt property. Thereafter, there are 4 checks: 1. #19264 for $54,339.55 on 2-14-00; 2. #19263 for $78,000.00 on 2-14-00; 3. #20203 for $119,393.42 on 2-18-00; and, 4. #21769 for $165,058.42 on 3-1-00, written on said account.

The Schmidts claim, however, that they did not discover the fraudulent nature of the transfers until July 26, 2005, when Realty Finance's former treasurer, Michael Chagami, was deposed.

---

[5]    In the ICA's decision in the foreclosure action, which was reversed on other grounds, this court noted that Hawai'i Rules of Civil Procedure (**HRCP**) Rule 54(b) did not authorize finalization of the April 11, 2000 or May 10, 2000 judgments.

D.    The Proceedings Below

On April 7, 2006, the Schmidts filed a complaint against Appellees, alleging that the transfers were made in an effort to defraud them of the moneys owed to them, as finally determined in the Hawai'i Supreme Court's March 18, 2004 decision, the subsequent accounting, and the December 21, 2004 final judgment.  In their complaint, the Schmidts alleged two causes of action, one for the fraudulent transfer of funds under Hawaii Revised Statutes (**HRS**) § 651C-4(a)(1) (1993), Hawai'i's Uniform Fraudulent Transfers Act (**UFTA**), and another for unfair or deceptive acts or practices pursuant to HRS § 480-2 (2008). Appellees moved for judgment on the pleadings on January 7, 2007. The Circuit Court granted Appellees' motion with respect to the HRS § 480-2 claims, but denied it as to the fraudulent transfers claims.  Appellees filed a motion for summary judgment on October 1, 2007, after discovery was taken, arguing that the fraudulent transfers claims were without merit, and in any event, were time-barred.  This motion was denied on the grounds that there were genuine issues of material fact relating to both arguments.

A two-day bench trial was held on July 1 and 2, 2008. Appellees again moved for a judgment on partial findings based on the argument that the Schmidts' claims were time-barred.  No order was entered on this motion.  The Circuit Court issued Findings of Fact (**FOFs**) and Conclusions of Law (**COLs**) on October 7, 2008, and entered Final Judgment in favor of Appellees that same day, holding that the Schmidts failed to prove an actual intent to hinder, delay, or defraud Realty Finance's creditors,

6

pursuant to HRS § 651C-4(a)(1). The Circuit Court's FOFs and

COLs; and Order of Dismissal state, in relevant part, the

following:

### Findings of Fact

. . . .

5.     This action relates to four allegedly fraudulent transfers by [Realty Finance]: (a) a check payable to [Eleanor], dated February 11, 2000, in the amount of $78,000; (b) a check payable to [Goodsill], dated February 15, 2000, in the amount of $119,393.42; (c) a check payable to [Richard], dated February 11, 2000, in the amount of $54,399.55; and (d) a check payable to [Kamehameha Schools] in the amount of $165,058.42 from February 2000 (these four checks are collectively referred to as "the Transfers").

6.     The Transfers were made from the proceeds of a mortgage foreclosure sale, which involved a transaction in which [the Schmidts] were the mortgagors and [Realty Finance], a subsidiary of HSC, was the mortgagee.

7.     The foreclosure sale proceeds received by [Realty Finance] were used for the Transfers. The Transfers were payments to creditors of HSC.

8.     There were some suspicious circumstances regarding the Transfers:
   a.     HSC was the parent company of [Realty Finance]. The Transfers were made to creditors of HSC in order to pay [Realty Finance's] obligations to HSC;
   b.     they were made through a separate account apparently created to effectuate them;
   c.     they were made immediately after receipt of the proceeds from the foreclosure sale; and
   d.     [The Schmidts] appealed the trial court's judgment so, at the time of the Transfers, it was questionable whether [Realty Finance] would prevail on appeal. In order for [Realty Finance] to prevail on appeal, the appellate court would have to determine that it was appropriate to require [the Schmidts] to, in effect, pay twice in order to obtain a release from the judgment received by [Realty Finance] in the foreclosure action: once to the assignee of the judgment and once to [Realty Finance] itself.

9.     These circumstances did not constitute clear and convincing evidence of any actual intent on the part of [Appellees] to hinder, delay, or defraud any creditors of [Realty Finance]:
   a.     When the Transfers were made, there was no actual debt owed to [the Schmidts] by [Realty Finance].
   b.     There was no expert testimony demonstrating that the Transfers were in violation of generally accepted accounting practices.
   c.     At the time of the Transfers, there was no business need to retain cash for the benefit of [the Schmidts] should [the Schmidts] prevail on appeal. The onus was on [the Schmidts] to obtain a stay in order to maintain the *status quo* pending the appeal. This would have enabled

7

them to have a fund available to recover from if they prevailed on appeal. [The Schmidts] did not seek or obtain such a stay.

d. At the time of the Transfers, [Realty Finance] had *bona fide* obligations owed to HSC and there was a legitimate business purpose in transferring RFI's assets to reduce those obligations.

e. [Realty Finance] did not have possession or control over the funds after the Transfers were made.

f. [Realty Finance] did not conceal the Transfers by, for example, not recording the Transfers in its accounting records or by entering into agreements with the transferees not to disclose the existence of the Transfers.

g. The Transfers did not render [Realty Finance] insolvent at the time they were made.

h. [Realty Finance] did not terminate its existence after the Transfers.

### Conclusions of Law

. . . .

5. Despite the facts reflected in [FOFs] 8(a)-(d), [the Schmidts] did not prove by clear and convincing evidence that [Realty Finance] actually intended to hinder, delay, or defraud any creditors of [Realty Finance], as required by HRS § 651C-4(a)(1).

### Order

Based upon the foregoing [FOFs and COLs], this action is to be dismissed and judgment is to be entered in favor of [Appellees] and against [the Schmidts].

Three days later, on October 10, 2008, Appellees moved for attorneys' fees and costs. On November 5, 2008, the Schmidts filed a timely notice of appeal from the October 7, 2008 judgment. The Circuit Court did not enter an order responding to Appellees' fees and costs motion until January 9, 2009, which was more than ninety days after Appellees filed the motion. Therefore, pursuant to Hawai‘i Rules of Appellate Procedure (**HRAP**) Rule 4(a)(3),[6] Appellees' motion was deemed to be

---

[6] HRAP Rule 4(a)(3) provides:

TIME TO APPEAL AFFECTED BY POST-JUDGMENT MOTIONS. If any party files a timely motion for . . . attorney's fees or costs, the time for filing the notice of appeal is extended until 30 days after entry of an order disposing of the motion; provided, that the failure to dispose of any motion by order entered upon the record within 90 days after the date the motion was filed shall constitute a denial of the motion.

8

automatically denied. Appellees filed a cross-appeal on January 9, 2009.

E. The ICA Memorandum Opinion

On August 30, 2013, this court issued a Memorandum Opinion concluding that the Schmidts' HRS § 651C-4(a)(1) fraudulent transfers claims were extinguished no later than one year after their discovery of the transfers on March 18, 2005 and that their April 7, 2006 complaint was untimely. See Schmidt v. HSC, Inc., No. 29454 and 29589, 2013 WL 4711524 (Haw. App. Aug. 30, 2013) (mem.) (**Schmidt I**). Accordingly, we did not reach the merits of the Schmidts' points of error contending that the Circuit Court erred in otherwise rejecting their fraudulent transfers claims. In addition, we ordered that the case be remanded to the Circuit Court for the limited purpose of allowing the Circuit Court to enter a ruling on the merits of Appellees' request for attorneys' fees and costs.

F. Certiorari Review

The Schmidts filed a petition for writ of certiorari seeking review of the ICA's August 30, 2013 decision. On January 15, 2014, the supreme court issued an Opinion holding, *inter alia*:

> [T]he one year statute of limitations period begins on the date the fraudulent nature of the transfer "was or could reasonably have been discovered by the claimant." HRS § 651C-9(1). The ICA incorrectly held that the statute of limitations runs from the date of [the discovery of] the transfer, rather than the date that Petitioners discovered the fraudulent nature of the transfer.

Schmidt v. HSC, Inc., 131 Hawai'i 497, 510, 319 P.3d 416, 429 (2014) (**Schmidt II**). The supreme court therefore vacated this

court's ruling on the statute of limitations and "remanded the issue to the ICA." Id. at 512, 319 P.3d at 431.

As the supreme court observed, however:

> [T]he [circuit] court did not discuss the statute of limitations in its findings and conclusions and therefore did not issue any findings or conclusions regarding when Petitioners discovered the "fraudulent nature" of the transfers.

Id. at 506, 319 P.3d at 425.

Nevertheless, the supreme court ordered:

> [W]e remand the case to the ICA for a ruling on the merits of the case, as raised in Petitioners' appeal herein from the October 7, 2008 judgment, irrespective of its decision on the statute of limitations issue on remand.

Id. at 512, 319 P.3d at 431.

Accordingly, this court will address the merits of the Schmidts' challenge to Circuit Court's rejection of their fraudulent transfers claims, irrespective of whether their claims are or may be barred by the statute of limitations.

II. POINTS OF ERROR

The Schmidts raise sixteen points of error on appeal, challenging as clearly erroneous FOFs 5, 7, 8.a. (in two ways), 9, 9.a., 9.b., 9.c., 9.d., 9.f., 9.g., as well as the Circuit Court's failure to make additional FOFs, contending that the Circuit Court's COL 5 was wrong, and asserting that the Circuit Court reversibly erred when it dismissed the Schmidts' action, entered judgment against them, and failed to award them damages, attorneys' fees, and costs.

On the cross-appeal, Appellees raise two points of error, contending that the Circuit Circuit erred when it failed to conclude that the Schmidts' claims were time-barred and when

it failed to timely award Appellees their attorneys' fees and costs.

III. <u>APPLICABLE STANDARDS OF REVIEW</u>

Findings of fact are reviewed under the clearly erroneous standard. <u>Bremer v. Weeks</u>, 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004). Conclusions of law are reviewed <u>de novo</u>. <u>Id.</u>

Fraudulent transfers must be proven by clear and convincing evidence. <u>Kekona v. Abastillas</u>, 113 Hawai'i 174, 181, 150 P.3d 823, 830 (2006).

IV. <u>DISCUSSION</u>

A. <u>The Schmidts' Challenge to the Circuit Court's Ruling</u>

The gravamen of the Schmidts' appeal is that the Circuit Court erred when it rejected their fraudulent transfers claims against Appellees. The Schmidts' claims were brought pursuant to HRS § 651C-4(a)(1),[7] which provides:

> **§ 651C-4 Transfers fraudulent as to present and future creditors.** (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]

The purpose of the UFTA is to stop a debtor from deliberately cheating a creditor by placing property beyond his or her reach. <u>See</u>, <u>e.g.</u>, <u>Gilchinsky v. Nat'l Westminster Bank N.J.</u>, 732 A.2d 482, 488 (N.J. 1999). As direct evidence of "actual intent to hinder, delay, or defraud" is rare, particularly when the intent to be proven is that of a corporate

---

[7] UFTA provides alternative methods to establish that a transfer is fraudulent, but these "constructive fraud" alternatives were not alleged by the Schmidts. <u>See</u> HRS §§ 651C-4(a)(2) (1993) and 651C-5(a & b) (1993).

11

transferor, UFTA includes a non-exclusive list of factors, sometimes referred to as badges of fraud, to aid the fact-finder. See, e.g., In re Roco Corp., 701 F.2d 978, 984 (1st Cir. 1983); In re Strehlow, 84 B.R. 241, 245 (Bankr. S.D. Fla. 1988). Thus, HRS § 651C-4(b) provides:

> (b) In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:
>
> (1)    The transfer or obligation was to an insider;
> (2)    The debtor had retained possession or control of the property transferred after the transfer;
> (3)    The transfer or obligation was disclosed or concealed;
> (4)    Before the transfer was made or obligation was incurred, the debtor was sued or threatened with suit;
> (5)    The transfer was of substantially all the debtor's assets;
> (6)    The debtor had absconded;
> (7)    The debtor had removed or concealed assets;
> (8)    The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9)    The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10)   The transfer had occurred shortly before or shortly after a substantial debt was incurred; and
> (11)   The debtor had transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor.

Without reference to HRS § 651C-4(b), in FOF 8, the Circuit Court described a handful of "suspicious circumstances" surrounding the transfers, and in FOF 9, the Circuit Court found that these circumstances did not constitute clear and convincing evidence of any actual intent to hinder, delay, or defraud, in light of other factors considered by the court, which were enumerated in FOF 9. The Schmidts argue that the Circuit Court's incomplete and erroneous findings led it to wrongly conclude that the Schmidts did not prove, by clear and convincing evidence,

that Realty Finance intended to hinder, delay, or defraud any creditors, most particularly the Schmidts.

   1.   The transfers (FOF 5)

   We begin with an examination of the transfers from Realty Finance that are at issue in this case.  In FOF 5, the Circuit Court identified the four February 2000 checks from Realty Finance to Eleanor in the amount of $78,000, to HSC's law firm in the amount of $119,393.42, to Richard in the amount of $54,399.55, and to another of HSC's creditors, Kamehameha Schools, in the amount of $165,058.48, for a total of $416,851.45.  The Circuit Court's focus on these transfers is well-grounded, as these transfers were specifically identified by the Schmidts in their Amended Complaint as fraudulent transfers and, as the Circuit Court found in FOF 8.c., these transfers were "made immediately after [Realty Finance's] receipt of the proceeds of the foreclosure sale."

   However, based on the evidence presented at trial, the Schmidts argued below and contend on appeal that Realty Finance made additional transfers for the benefit of HSC in 2000, for a total amount of $986,655, not just the $416,851.45 of transfers identified by the Circuit Court in FOF 5.  In his trial testimony, Richard confirmed that there was a total "intercompany transfer" from Realty Finance to HSC (or HSC's creditors) in this amount in 2000, which amount also was supported by the Schmidts' trial exhibits, including HSC's consolidated balance sheet for the period ending December 31, 2000.  Richard further testified that the transfers of funds from Realty Finance to or for the

13

benefit of HSC were not pursuant to any loan agreement; rather, it was the return of HSC's capital investment in Realty Finance.

Appellees do not deny that Realty Finance's transfers to or for the benefit of HSC in 2000 totaled $986,655, but instead argue that FOF 5 is an accurate statement of the transfers alleged in the Complaint and, therefore, the Schmidts' alleged error is irrelevant to the Schmidts' fraudulent transfers allegations. We disagree with the latter contention. The fact that Realty Finance "upstreamed" this money to HSC, as Richard and Chagami both described it in their trial testimony, as well as $86,527.24 in 2001 and $188,808.93 in 2002, which Richard and Chagami also confirmed at trial, left Realty Finance with $8,689.02 in its checking account at the end of 2002 (along with other minimal assets). It is undisputed that, by the time the foreclosure litigation was completed and judgment was entered in favor of the Schmidts, Realty Finance was unable to pay the judgment. The evidence of the additional transfers from Realty Finance to HSC is relevant to the critical issue of Realty Finance's motive, plan, modus operandi or intent, and, ultimately, whether Realty Finance acted with actual intent to hinder, delay, or defraud its creditors through the 2000 transfers, within the context of UFTA. See, e.g., Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488, 504 (N.D. Ill. 1988) ("A general scheme or plan to strip the debtor of its assets without regard to the needs of its creditors can support a finding of actual intent.") (citing In re F & C Services, Inc., 44 B.R. 863, 872 (Bankr. S.D. Fla. 1984)). Although the

particular findings stated in FOF 5 are not clearly erroneous, the lack of further findings regarding the evidence of Realty Finance's other transfers to HSC leaves us unable to determine whether the court considered this undisputed evidence in the context of its ultimate determination that the Schmidts failed to establish, by clear and convincing evidence, Realty Finance's actual intent to hinder, delay, or defraud its creditors.

2.    Realty Finance's creditors (FOF 7)

In FOF 7, the Circuit Court found that the foreclosure sales proceeds received by Realty Finance were used for payments to creditors of HSC.  The Schmidts contend that, although FOF 7 is accurate, the Circuit Court clearly erred in making this finding because it failed to find that HSC itself was not a creditor of Realty Finance.  As a preliminary matter, the fact that HSC was not a creditor of Realty Finance is undisputed. Henderson and Chagami both testified that Realty Finance was not indebted to HSC; rather, HSC invested capital into Realty Finance.  As noted above, no one contests the Circuit Court's finding that the four February 2000 checks were payments to creditors of HSC.  It is undisputed that the recipients were not creditors of Realty Finance.

Although not the subject of any findings by the Circuit Court, it also appears undisputed that (other) Realty Finance funds were used a few weeks earlier in 2000 to pay off the principal and interest due on a $250,000 loan First Hawaiian Bank made to HSC, as well as pay down $150,000 on another loan First Hawaiian Bank made to HSC.  The evidence presented at trial

suggests that HSC may have borrowed at least $350,000 from First Hawaiian Bank for the purpose of infusing capital into Realty Finance pursuant to a Federal Deposit Insurance Corporation (**FDIC**) Cease and Desist Order directed at Realty Finance; however, it is clear from the face of the FDIC's order that an increase in Realty Finance's Tier 1 <u>capital</u>, not an increase in its <u>debt</u>, was required by the FDIC. Thus, although Realty Finance had discontinued operations as a Thrift[8] by the time of 2000 transfers, and was no longer required to maintain compliance with the FDIC mandate, the indebtedness to First Hawaiian Bank was clearly HSC's debt, not Realty Finance's debt.

Appellees' response to the Schmidts' contention of error is that it is irrelevant that HSC was an investor of capital in Realty Finance, as opposed to a creditor of Realty Finance.[9] Instead, Appellees argue, what is relevant is *their* state of mind and *their* good faith belief that Realty Finance was expected to "repay" HSC for the funds that HSC invested in Realty Finance. Citing <u>Mayors v. Comm'r of Internal Revenue</u>, 785 F.2d

---

[8]     The FDIC defines a Thrift as follows:

> Thrift – A financial institution that ordinarily possesses the same depository, credit, financial intermediary, and account transactional functions as a bank, but which is chiefly organized and primarily operated to promote savings and home mortgage lending rather than commercial lending. A thrift can also be known as a savings bank, a savings association, a savings and loan association, or an S&L.

FEDERAL DEPOSIT INSURANCE CORPORATION, RESOLUTIONS HANDBOOK 37 (December 23, 2014), https://www.fdic.gov/about/freedom/drr_handbook.pdf (last visited August 12, 2015).

[9]     It appears that the Circuit Court was persuaded by this argument because the court did not recognize the distinction between indebtedness versus a capital contribution and, instead, found in FOF 9.d. that: "At the time of the Transfers, [Realty Finance] had *bona fide* obligations owed to HSC and there was a legitimate business purpose in transferring [Realty Finance's] assets to reduce those obligations."

757, 761 (9th Cir. 1986), Appellees submit: "Where a defendant has a good faith belief that an obligation must be paid – as opposed to the actual legal enforceability of the obligation being paid – the former is determinative." This supposition is flawed on a number of levels.

First, while a transferee's "good faith" may, when combined with "reasonably equivalent value," provide a defense and protection of the transferee from the voiding of a transfer otherwise proven to be fraudulent pursuant to HRS § 651C-4(a)(1),[10] the relevant inquiry, in the first instance, is whether the alleged fraudulent transferor made the transfer with the actual intent to hinder, delay, or defraud any of its creditors. See HRS § 651C-4(a)(1); see also, e.g., S.E.C. v. Res. Dev. Int'l, LLC, 487 F.3d 295, 301 (5th Cir. 2007) ("'the transferees' knowing participation is irrelevant under the statute' for purposes of establishing the premise of (as opposed to liability for) a fraudulent transfer") (citation omitted); Valvanis v. Milgroom, 529 F. Supp. 2d 1190, 1199 (D. Haw. 2007) (same); Wieselman v. Hoeniger, 930 A.2d 768, 772-73 (Conn. App. 2007), cert. denied, 934 A.2d 245 (Conn. 2007); see also Dillard v. Schlussel, No. 315484, 2014 WL 5361675 (Mich. App. Oct. 21, 2014), quoting In re Cohen, 199 B.R. 709, 716 (B.A.P 9th Cir. 1996) (holding, with respect to an "actual intent" fraudulent

---

[10] HRS § 651C-8 (1993) provides, in relevant part:

§ 651C-8 Defenses, liability, and protection of transferee. (a) A transfer or obligation is not voidable under section 651C-4(a)(1) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

17

transfers claim under Michigan's UFTA statute, that "the determination that the transfer is fraudulent is conceptually distinct from the avoidance of the transfer") (format altered). In other words, first, the fact-finder must determine whether there is clear and convincing evidence of the transferor's fraudulent intent. Then, the fact-finder may examine whether the transferee took in good faith *and* for reasonably equivalent value.

Second, the Mayors case relied on by Appellees is inapposite. Susan Mayors (**Mayors**) was the secretary and receptionist of Dr. Joseph Averna (**Averna**) when they became involved, moved in together, and had a child, but did not marry. Mayors, 785 F.2d at 758. During their cohabitation, Mayors worked for Averna as a secretary, bookkeeper, and x-ray technician, and kept house for Averna. Id. She was paid below-market wages for her office work and nothing for her housework, but was given funds for basic living expenses and occasional special needs. Id. at 758-59. When they separated years later, through Mayors's counsel, they reached an oral agreement whereby Averna would, *inter alia,* transfer to Mayors the house that she and their child were living in. Id. at 759. At the time of the transfer, Averna was insolvent and owed taxes to the Internal Revenue Service (**IRS**). Id. Pursuant to a federal statute, 26 U.S.C. § 6901(a), the IRS sought to hold Mayors liable as a transferee for the payment of Averna's unpaid taxes. Id. at 759-60.

The Ninth Circuit Court of Appeals (**Ninth Circuit**) ruled in favor of Mayors, and against the IRS, based on its interpretation and application of a California fraudulent conveyance statute. Id. at 759-62. The applicable statute worked as follows: once a *prima facie* case was established that Averna was insolvent, Mayors had to prove that the transfer was for fair consideration. Id. at 760.[11] Mayors argued that "the transfer of the house was in settlement of [Averna's] preexisting debt [to Mayors], and so constitute[d] fair consideration." Id. (emphasis added). The lower court found, however, that Mayors had failed to prove the value of her services (*i.e.*, the dollar amount that she was owed) and thus rejected her argument that she had an enforceable right to be compensated for them. Id. at 760-61. The Ninth Circuit overruled the trial court and held (in a passage cited by Appellees):

> Whether however, Mayors actually had an enforceable right against Averna, is irrelevant to the fairness of the consideration if Mayors and Averna *believed in good faith* that she had such a right and the transfer was made to satisfy it or in exchange for her forbearance from enforcing it. It is well established in contract law that forbearance to exercise a legal right is sufficient consideration, as is compromise of a claim, even if doubtful or disputed.

Id. at 761 (citations omitted).

Appellees seize upon this language to argue that HSC's and the Hendersons' good faith belief that they always expected repayment of HSC's investment in Realty Finance is determinative and, therefore, the fact that it was invested capital and not debt is irrelevant. We reject this argument. First, in Mayors,

---

[11] The California statute, Cal. Civ. Code Ann. § 3439.04 (West 1970), is similar, but not identical, to HRS § 651C-5(a), which was not relied upon by the Schmidts in pleading their fraudulent transfers claims.

there was no issue of debt versus a capital investment. Mayors believed that Averna owed her money for her services. In addition, the "fair consideration" in Mayors was Mayors's forbearance, *i.e.*, the settlement of her claim against Averna for the payment of debt. Appellees are not arguing here that Realty Finance owed HSC a debt (as opposed to a return of its capital investment) and that the transfers were made for HSC's forbearance from filing suit on such indebtedness. In sum, the Mayors case simply does not support Appellees' assertion that the distinction between debt and invested capital is irrelevant.

Third, the return of a capital contribution to or for the benefit of an investor is not the same as the repayment of indebtedness to a creditor. As a Pennsylvania federal court aptly explained, applying Pennsylvania's UFTA:

> PUFTA states that value is given where "property is transferred or an antecedent debt is secured or satisfied." 12 PA. CONS.STAT. § 5103(a). Defendant does not claim that property has been transferred, but does contend that its $57 million capital contribution to the Fund created a debt that the Fund was contractually obligated to satisfy pursuant to the distribution provisions of the Limited Partnership Agreement ("LPA").
>
> PUFTA defines "debt" as "liability on a claim." 12 PA. CONS.STAT. § 5101(b). In turn, "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured or unsecured." Id. It is well-established that a limited partnership interest constitutes an equity security. Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 252 (3d Cir. 2000). In turn, courts within the Third Circuit have consistently held that equity interests are not "debt" within the meaning of PUFTA or the Bankruptcy Code's analogous fraudulent transfer provision. In re Joshua Slocum, Ltd., 103 B.R. 610, 623 (Bankr. E.D. Pa.1989) (stating that stockholders' right to dividends is dependent on financial solvency of corporation, and is therefore not fixed liability or debt); In re Fidelity Bond and Mortg. Co., 340 B.R. 266, 286-87 (Bankr. E.D. Pa. 2006) (finding that issuance of dividends returned no value to debtor); In re Color Tile, Inc., No. CIV.A.98-358, 2000 WL 152129, at *5 (D. Del. Feb. 9, 2000) (finding that the purchase of preferred shares and resulting dividends were an equity interest, and thus that the

dividend payments could not constitute satisfaction of an antecedent debt).

It follows, then, that limited partnership distributions do not qualify as "antecedent debt" constituting an exchange "for value" for the purposes of PUFTA. It is widely held that true creditors "hold claims regardless of the performance of the partnership business," whereas payment of partnership distributions are "subject to [ ] profits or losses." In re Riverside-Linden Inv. Co., 925 F.2d 320, 323 (9th Cir. 1991). To hold that a limited partner interest constitutes a debt of the partnership would allow limited partners to receive distributions ahead of even secured creditors. Such a holding would be inconsistent with both the purpose of PUFTA (to protect creditors) and the meaning of "distributable funds" within the LPA at issue here (those funds not subject to "indebtedness or liabilities"). Consistent with this logic, several courts have held that distributions made on account of partnership interests do not give rise to a "right to payment" and are thus not "for value." See, e.g., In re Agric. Research & Tech. Grp., Inc., 916 F.2d 528 (9th Cir. 1990) (distributions to a limited partner "were not for value because [the partnership] made the distributions on account of the partnership interests and not on account of debt or property transferred to the partnership in exchange for the distribution"); In re Thunderdome Houston Ltd. P'ship, No. CIV.A.98-4615, 2000 WL 889846 (Bankr. N.D. Ill. June 23, 2000).

Defendant attempts to undercut the aforementioned cases by arguing that, even if its investment in the partnership did not create debt, its contribution conferred "value" on the partnership via the risk it undertook by investing with the hope of a future economic benefit. The cases Defendant offers in support of this proposition, while numerous, fail to persuade the Court that equity investments confer value on a transferor. . . .

Based on careful examination of current UFTA jurisprudence and the policies underlying the statute, the Court finds that Defendant's capital contributions to the Fund, a limited partnership in which Defendant had an ownership interest, did not constitute an exchange of value sufficient to create an antecedent debt. It follows that Defendant cannot, as a matter of law, assert a defense to judgment under 5108(b)(2).

United States v. Rocky Mountain Holdings, Inc., 782 F. Supp. 2d 106, 122-24 (E.D. Pa. 2011) (footnotes omitted).

Sitting en banc, the Arizona Supreme Court agreed with this fundamental distinction between debt and equity, in the context of an UFTA constructive fraud analysis:

The court of appeals concluded that Suncrest's distribution to the limited partners was not a "transfer for value" under A.R.S. section 44-1003(A). Hullett [v. Cousin], 201 Ariz. at 123, ¶ 14, 32 P.3d at 48. As pointed out by the court of

> appeals, distribution of a limited partner's capital contribution is the return of an asset, not satisfaction of an antecedent debt. <u>Id.</u> at 123, ¶ 15, 32 P.3d at 48; <u>see also</u> <u>In re Riverside-Linden Investment Co.</u>, 925 F.2d 320, 323 & n. 1 (9th Cir. 1991) (finding interest in a partnership is not a debt of the partnership). We agree with this reasoning. Under A.R.S. section 44-1003(A), <u>**a distribution of assets previously advanced by the limited partners, for example capital contributions, may be a return of value previously advanced to the partnership, but it is not a transfer for value.**</u>[12]

<u>Hullett v. Cousin</u>, 63 P.3d 1029, 1035-36 (Ariz. 2003) (en banc) (footnote omitted; emphasis added).

Numerous other courts, in various contexts, have recognized the important distinction between the repayment of indebtedness and the return of invested capital. <u>See</u>, <u>e.g.</u>, <u>Yankee Microwave, Inc. v. Petricca Commc'ns Sys., Inc.</u>, 760 N.E.2d 739, 760 (Mass. App. Ct. 2002) (where loans were a substitute for capital, and thus treated as capital contributions, repayment of such loans leaving insufficient capital as to those who are or would become creditors, was held to be a transfer without fair consideration in violation of Massachusetts's fraudulent conveyance act); <u>Tanzi v. Fiberglass Swimming Pools, Inc.</u>, 414 A.2d 484, 489 (R.I. 1980) ("Clearly, persons making capital contributions are not corporate creditors."); <u>In re Lexington Oil & Gas Ltd., Co.</u>, 423 B.R. 353 (Bankr. E.D. Okla. 2010) (analyzing distinction between debt and equity in conjunction with UFTA analysis); <u>Rapid Displays, Inc. v. Gorder</u>, No. 02-252-JE, 2007 WL 1796002 (D. Or. June 20, 2007) (repayment of capital contribution, as opposed to loan, may be relevant to UFTA claim); <u>In re Dewey & LeBoeuf LLP</u>, 518 B.R. 766,

---

[12] A.R.S. section 44-1003(A) is (with the addition of a pair of parenthetical commas) identical to HRS § 651C-3(a), which defines when "value" is given for a transfer or obligation.

789-90 (Bankr. S.D.N.Y. 2014) (holding that, to the extent the challenged transfers were made as returns of former partners' capital contributions, the transfers were not made on account of antecedent debts and therefore could not be construed as "reasonably equivalent value" as a matter of law).

In sum, we conclude that, although FOF 7's finding that the alleged fraudulent transfers were payments to the creditors of HSC is accurate, the Schmidts' contention that the Circuit Court erred in failing to find that HSC was not a creditor of Realty Finance has merit.

3.    Challenges to FOF 8.a.

The Schmidts challenge FOF 8.a. on grounds similar to their challenge to FOF 7.  In FOF 8.a., the Circuit Court found that the allegedly fraudulent transfers were made to HSC's creditors in order to "pay" Realty Finance's "obligations" to HSC.  While not disputing that such payments were made, the Schmidts argue, in effect, that construing these transfers as payments for obligations blurs the distinction between the payment of Realty Finance's creditors and the return of invested capital to or for the benefit of insider investors.  The Schmidts submit that when, instead of paying its debts, or retaining sufficient funds to pay its debts, Realty Finance transferred these funds to or for the benefit of its insider investors, Realty Finance's actions constituted strong evidence of actual intent to hinder, delay, or defraud its creditors.

Again, Appellees argue that, because HSC had made capital investments in Realty Finance in excess of $1,000,000,

and expected "repayment," the Circuit Court's finding is supported by the evidence and is not clearly erroneous. This argument ignores, however, the fundamental tenet, that a shareholder's "right" to receive return of invested capital and/or the profits of a corporation is subject to the rights of the corporation's creditors. See, e.g., Hamilton v. Conley, 827 N.E.2d 949, 958 (Ill. App. Ct. 2005) ("Shareholders of a corporation are entitled to receive the corporation's assets *subject* to the rights of the corporation's creditors.") (citation omitted; emphasis in original). We agree with the Schmidts that the Circuit Court's failure to recognize the important distinction between the payment of debt owed to a creditor and the return of invested capital to an investor, which is reflected in FOF 8.a., caused or contributed to an erroneous conclusion that the Schmidts failed to establish clear and convincing evidence of Realty Finance's actual intent to hinder, delay, or defraud any of its creditors.

4.  "Actual debt" owed to the Schmidts (FOF 9.a.)

In FOF 9, the Circuit Court identifies several circumstances as support for its conclusion that the Schmidts failed to demonstrate "clear and convincing evidence of any actual intent on the part of *any Defendant* to hinder, delay, or defraud any creditors of [Realty Finance]." (Emphasis added.) First, as discussed above, the relevant intent in conjunction with an HRS § 651C-4(a)(1) claim is the intent of the transferor, Realty Finance. The transferees' fraudulent intent, lack thereof, or even good faith acceptance of the transferred asset,

24

is not at issue in the determination of the transferor's actual intent to hinder, delay, or defraud as to present and future creditors.[13] The Circuit Court's reference in FOF 9 to "any Defendant" appears to include HSC and the Hendersons, but not transferor Realty Finance, which erroneously frames the key issue, which is the actual intent of the *transferor*.[14]

In FOF 9.a., the Circuit Court found that, when the allegedly fraudulent transfers were made, "there was not actual debt owed to [the Schmidts] by [Realty Finance]." As the Schmidts argue, however, in a November 23, 2007 pre-trial order denying Appellees' motion for summary judgment (**Pre-trial Order**), the Circuit Court correctly included, *inter alia*, the following ruling:

> Under HRS § 651C-1, a 'debtor' 'means a person against whom a creditor has a claim.' A 'creditor' 'means a person who had a claim against a debtor.' HRS § 651C-1. Finally, a 'claim':
>> 'means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.'
> HRS § 651C-1.
> Based on these definitions, at the time of the transfers in this case, [the Schmidts] were still 'creditors' of Realty Finance even though Realty Finance had so far prevailed in the foreclosure action. . . .
>> . . . .
> Realty Finance was subject to [the Schmidts'] claim for recovery in the foreclosure action at the time the transfers were made.

---

[13]    As noted, however, HRS § 651C-8 provides a defense for a transferee who took in good faith *and* for reasonably equivalent value.

[14]    In response to the Schmidts' assertions of error in FOF 9 generally, and FOF 9.a. in particular, Appellees fail to acknowledge that the "actual intent" at issue in this case is that of the transferor, Realty Finance, and instead submit that the Circuit Court was not clearly wrong in FOF 9 because FOF 9 indicates that it addresses *their* lack of actual intent to hinder, delay, or defraud. This circular argument is unavailing. In order to properly adjudicate the Schmidts' HRS § 651C-4(a)(1) claims, the Circuit Court needed to address whether clear and convincing evidence established *Realty Finance's* actual intent to hinder, delay, or defraud its creditors.

The Schmidts argue that the Circuit Court erred when it apparently abandoned this analysis in FOF 9.a. by finding that there was "no actual debt" owed to the Schmidts by Realty Finance.

In response, Appellees ignore the Schmidts' reference to the Circuit Court's ruling in the Pre-trial Order and instead argue that the Schmidts "cannot demonstrate that FOF No. 9a was not supported by the evidence" because the "Schmidts' imaginative theory that their 2004 judgment can be retroactively considered a 'claim' dating back to 2000 does not change that no 'actual' <u>debt</u> was owed to the Schmidts in 2000." As the Circuit Court recognized in the first instance (in the Pre-trial Order), HRS § 651C-4(a)(1) claims are not limited to fraudulent transfers made to hinder, delay, or defraud creditors who have claims that have been finally adjudicated. In fact, as noted by the Circuit Court in the Pre-trial Order, pursuant to HRS § 651C-1, a creditor is "a person who had a claim against a debtor" and a claim is "a right to payment, <u>whether or not the right is reduced to judgment</u>, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." (Emphasis added.)

Indeed, HRS § 651C-4 is entitled "Transfers fraudulent to present <u>and future</u> creditors." (Emphasis added.) As the United States District Court for the District of Hawai'i has recognized, "Hawaii's Uniform Fraudulent Transfer Act, HRS Chapter 651C-4, has abrogated the common law distinction between pre-existing creditors and subsequent creditors." <u>Sherry v.</u>

Ross, 846 F. Supp. 1424, 1429 n.4 (D. Haw. 1994). Courts in other UFTA jurisdictions have similarly addressed the fallacy of Appellees' argument, including as follows:

> [A]ppellees argue that the transfer of the subject property to the trust could not have been fraudulent because no litigation had commenced at the time of transfer, and Blood had yet to become a judgment creditor. This argument is also incorrect: R.C. 1336.04 refers to the attempt by the debtor to avoid a "claim" or a potential claim, not the execution of a judgment, . . . and a "claim" may arise before litigation commences to enforce that claim. Thus, a debtor may make a fraudulent transfer in anticipation of a claim.

Blood v. Nofzinger, 834 N.E.2d 358, 364-65 (Ohio Ct. App. 2005), citing Colonial Guild Ltd. v. Pruitt, No. 00CA007696, 2001 WL 324377 (Ohio Ct. App. Apr. 4, 2001) (also applying Ohio's UFTA statute); Kilker v. Stillman, No. G045813, 2012 WL 5902348 at *4-5 (Cal. Ct. App. Nov. 26, 2012) (discussing protection of future, as well as present, creditors under UFTA).

> . . . The UFTA "broadly defines the word 'creditor' to mean any person who has a claim." [National Loan Investors, L.P. v. Givens, 952 P.2d 1067, 1069 (Utah 1998)] (citing Utah Code Ann. § 25-6-2(4)). A "claim" is also broadly defined under the UFTA as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Utah Code Ann. § 25-6-2(3).
>
> Based on the broad definition of a claim under the UFTA and the direction from our supreme court to construe the statute liberally, we hold that Jeanne was "indeed, a creditor of [Robert], given that [her] claim to the [properties]—although not reduced to judgment [at the time]—had arisen through recent threats [of civil action]." Bradford, 1999 UT App 373 at ¶ 16, 993 P.2d 887. Jeanne's numerous threats of suit and Robert's awareness of probable legal action against him amount to a "claim" for purposes of the UFTA. See United States v. Green, 201 F.3d 251, 257 (3d Cir. 2000) (citing Baker v. Geist, 457 Pa. 73, 321 A.2d 634 (1974), for the holding that mere "awareness of a probable legal action against a debtor amounts to a debt" for purposes of the Pennsylvania Uniform Fraudulent Conveyances Act); Bradford, 1999 UT App 373 at ¶ 16, 993 P.2d 887; 37 Am.Jur.2d Fraudulent Conveyances and Transfers § 3 (2001) ("The existence of a debt is a requirement for bringing a fraudulent conveyance action and generally speaking, the awareness of probable legal action against a debtor amounts to a 'debt.'" (footnotes omitted)). The trial court found that "[w]hile the Plaintiff, Jeanne Tolle, did not file civil suit until February, 2002 in Florida and procure a

> judgment until September 24, 2004, the Plaintiff made her
> intentions clear to Robert Tolle and the other defendants
> prior to any transfers." For purposes of the UFTA, Jeanne
> is therefore a creditor whose claim arose before Robert
> transferred the properties.

Tolle v. Fenley, 132 P.3d 63, 66-67 (Utah App. 2006); see also

Morris v. Schnoor, Nos. 315006, 315007, 315702, 315742, 2014 WL

2355705 at *51 (Mich. App. May 29, 2014) (applying Michigan's

UFTA statute).

This case is even clearer. The Schmidts and Realty

Finance were actively involved in pending litigation over the

Schmidts' claim to the transferred funds when the allegedly

fraudulent transfers were made. The concept of "actual debt," as

stated in FOF 9.a., is a red herring. The Schmidts were UFTA

creditors of Realty Finance at the time of the subject transfers.

The Circuit Court clearly erred in relying on FOF 9.a. to support

its conclusion that the Schmidts failed to prove their claims.

### 5. Expert testimony re GAAP practices (FOF 9.b.)

In FOF 9.b., the Circuit Court found that there was no

expert testimony that the allegedly fraudulent transfers were in

violation of generally-accepted accounting practices (**GAAP**). As

Appellees argue, this appears to accurately reflect the record in

this case - there was no such testimony. The Schmidts' challenge

to this finding, however, is a challenge to the Circuit Court's

consideration of this fact as part of the short list of

enumerated facts that led to the Circuit Court's conclusion that

the evidence in the record was insufficient to meet the Schmidts'

burden of proof in demonstrating fraudulent intent. As the

Schmidts frame the issue, the "looting" of Realty Finance's

assets while the litigation over the proper disposition of the foreclosure proceeds was still pending amounted to a preference of HSC's creditors over Realty Finance's creditors and no court would require expert opinions on whether such egregious conduct is permissible. Appellees counter that the absence of expert testimony demonstrating that the alleged fraudulent transfers violated GAAP is a failure of proof that there was any impropriety involved in the transfers. Appellees cite no authorities requiring proof of GAAP violations to evidence actual intent to hinder, delay, or defraud under UFTA.

We do not adopt the Schmidts' colorful terminology (*i.e.*, looting of corporate assets), but we recognize the basic tenet of corporate law that a corporation's creditors are entitled to be satisfied before the corporation's assets are distributed to and/or for the benefit of its shareholders. See, e.g., HRS § 414-111 (2004) (permitting corporate distributions to shareholders unless, as a result, *inter alia*, "[t]he corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy [superior] preferential [shareholder] rights"). Although we cannot conclude that the fact stated in FOF 9.b. is clearly erroneous, it has no evidentiary value under the circumstances of this case.[15]

---

[15] This is particularly true considering that, in FOF 9, the Circuit Court was examining Appellees' intent, rather the Realty Finance's intent, to

(continued...)

6.    No stay pending appeal (FOF 9.c.)

The Schmidts contend that the Circuit Court clearly erred in FOF 9.c., wherein it found, *inter alia*, that "[t]he onus was on [the Schmidts] to obtain a stay in order to maintain the *status quo* pending the appeal." We agree with the Schmidts. Although not dispositive of the issue, we note that the allegedly fraudulent transfers were completed *prior* to the entry of an appealable judgment on the January 31, 2000 order directing the foreclosure commissioner to distribute the sales proceeds to Realty Finance over the Schmidts' objections. Thus, there was no opportunity for the Schmidts to "maintain the *status quo*" by seeking a stay pending appeal; the money was gone before the order was even appealable. In fact, as the Circuit Court recognized in FOF 8.c., the timing of the transfers, immediately after Realty Finance's receipt of the proceeds of the foreclosure sales, was itself a suspicious circumstance; as discussed further below, the timing of the transfers constitutes evidence of Realty Finance's intent to hinder, delay, or defraud its creditors. As to the assertion of error in FOF 9.c., more importantly, the Schmidts' failure to swiftly act, in anticipation that Realty Finance might immediately transfer the funds out of reach of its creditors, is wholly irrelevant to the issue of whether Realty Finance did so with the actual intent to hinder, delay, or defraud any of its creditors.

---

[15](...continued)
determine whether the Schmidts had met their burden of proof on their HRS § 651C-4(a)(1) claims.

7.     *Bona fide* obligations/legitimate business purpose
       (FOF 9.d.)

The Schmidts challenge FOF 9.d., wherein the Circuit Court found that Realty Factors had "*bona fide* obligations owed to HSC" and that there was a "legitimate business purpose" for the transfers.  Appellees point to HSC's "advance" of moneys, *i.e.*, its capital contributions to Realty Finance.  In addition, Appellees point to the evidence that Realty Finance "had no real operations remaining in 2000 requiring funds, since the vast bulk of its business had been sold off under FDIC supervision." Chagami testified that a decision was made in 1999 to wind down Realty Finance, to exit the business; Richard described it as Realty Finance being liquidated.  Appellees' argument, which was expressly adopted by the Circuit Court, is that the "legitimate business purpose" was the pay back of the moneys advanced by HSC and the "*bona fide* obligation" was the obligation to return invested capital to Realty Finance's investors as part of the wind up of its business.  In isolation, these specific findings are not wholly inaccurate because the return of invested capital during a corporate liquidation is a legitimate business purpose, *provided that the corporation's creditors are satisfied.*[16]  In the context of FOF 9, which sets forth the reasons that the Circuit Court articulated for ruling against the Schmidts, these findings ignore the fundamental difference between debt and

---

[16]     Richard acknowledged this obligation at trial, in conjunction with his testimony that Realty Finance was being liquidated in 2000 because it was out of business.  In response to the question of "what's involved in a liquidation phase of a corporate business," Richard answered:  "Collecting [your] assets and paying off your liabilities and giving the money back to the shareholder."

equity, discussed above, and Realty Finance's duty in a wind up to satisfy its creditors before returning capital to its insider investors. See, e.g., HRS § 414-111 (Hawai'i Business Corporation Act provision regarding distributions to shareholders); Tanzi, 414 A.2d at 489, 491 ("persons making capital contributions are not corporate creditors;" capital contributions are subordinated to the claims of the general creditors); Rocky Mountain Holdings, Inc., 782 F. Supp. 2d at 122 (equity interest is not a debt; return of a capital contribution is not satisfaction of an antecedent debt constituting an exchange for value under UFTA); TSA Int'l Ltd. v. Shimizu Corp., 92 Hawai'i 243, 262-63, 990 P.2d 713, 732-33 (1999) (TSA was an investor, not a creditor of transferor, within the meaning of UFTA, and therefore not eligible to bring fraudulent transfers claim). Realty Finance's failure to satisfy its creditors or retain sufficient assets to do so, and to instead, in effect, return invested capital to its insider investor, is evidence of actual intent to hinder, delay, or defraud its creditors. Thus, the Circuit Court clearly erred in construing the "bona fide obligations" and "legitimate business purpose" as circumstances that mitigated the indicia of Realty Finance's actual intent to hinder, delay, or defraud in this case.

8.    Concealment (FOF 9.f.)

In FOF 9.f., the Circuit Court found that Realty Finance did not conceal the allegedly fraudulent transfers, noting that it did not, for example, fail to record the transfers in its accounting records or require the recipients of the

tranfers to enter confidentiality agreements. We agree. We note that Realty Finance's opening of a separate bank account, which neither Henderson or Chagami could explain at trial, apparently for the purpose of depositing and then distributing the foreclosure sales proceeds, by way of checks that were not imprinted with the account owner/drawer's name and address (i.e., Realty Finance's), is at least unusual and appears to be suspicious. However, fraudulent concealment involves an affirmative act of active concealment, rather than a failure to proactively disclose. See, e.g., Schempp v. Lucre Mgmt. Grp., LLC, 75 P.3d 1157, 1162 (Colo. App. 2003) (transfer was not concealed generally and was recorded in books, therefore not concealed); Bostwick v. Thomas, No. 2008-0466, 9 Pa. D. & C. 5th 353, 359, 2009 WL 5909302 (Pa. Com. Pl. Nov. 12, 2009) ("failure by defendant Thomas to inform plaintiff of the existence of the property does not amount to concealment"); Grimmett v. Brown, 75 F.3d 506, 515 (9th Cir. 1996) (fraudulent concealment requires active concealment). Thus, we conclude that the Circuit Court properly found that concealment was not established.

9.    Insolvency (FOF 9.g.)

In FOF 9.g., the Circuit Court found that the four allegedly fraudulent transfers that took place immediately after Realty Finance received the sales proceeds from the foreclosure commissioner did not render Realty Finance insolvent at the time they were made. This finding pertains to HRS § 651C-4(b)(9), which states that, in determining actual intent under HRS § 651C-4(a)(1), the trier-of-fact may consider whether "[t]he debtor was

insolvent or became insolvent shortly after the transfer was made[.]" HRS § 651C-2(a) provides that a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." HRS § 651C-2(d) adds that "[a]ssets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors[.]"

The Schmidts highlight the FDIC's actions against Realty Finance, which necessitated capital infusions from HSC, as evidence that Realty Finance had been insolvent for three years before the allegedly fraudulent transfers. The Schmidts also direct this court to the undisputed evidence that Realty Finance transferred substantially all of its assets to and/or for the benefit of HSC by the end of 2002, before the 2004 completion of the litigation over who was entitled to the foreclosure proceeds. This evidence tends to show that the allegedly fraudulent transfers were part of an overall series of transactions intended to "upstream" nearly all of Realty Finance's assets to and/or for the benefit of its insider investors, to the detriment of its creditors, as that term is defined in HRS § 651C-1, most particularly the Schmidts, who were actively litigating their entitlement to the foreclosure proceeds. See, e.g., In re Mussa, 215 B.R. 158, 169 (Bankr. N.D. Ill. 1997);[17] Falcon v. Thomas,

---

[17] In Mussa, 215 B.R. at 169, the court explained:

> [T]he transfers consisted of substantially all of Debtors' assets and left them insolvent. In this regard, it must initially be pointed out that the series of transfers by Debtors of their cash, property, and business to their son may be considered together for purposes of UFTA.

(continued...)

629 N.E.2d 789, 796-97 (Ill. App. Ct. 1994) (in a constructive fraud case, considering debtor's later transfers, which were not specifically challenged as fraudulent, as "part of the totality of the circumstances"). However, the evidence regarding the overall scheme to "upstream" Realty Finance's cash assets does not demonstrate that Realty Finance was insolvent or became insolvent shortly after the four specific transfers referenced in FOF 8.g. were made. On appeal, the Schmidts point to no specific evidence of insolvency at that particular time. Accordingly, although the February 2000 transfers were indisputably part of a larger series of transfers to HSC that rendered Realty Finance judgment proof, we reject the Schmidts' argument that the Circuit Court clearly erred in the narrow finding stated in FOF 9.g.

10. <u>The Schmidts' remaining contentions of error</u>

The Schmidts make several additional arguments, which we will categorize as: (a) arguments that the Circuit Court

---

[17](...continued)

Although the language of the UFTA speaks in terms of a single transfer of property, a series of transfers may also be found to be fraudulent. <u>See Falcon v. Thomas</u>, 258 Ill. App. 3d 900, 196 Ill. Dec. 244, 629 N.E.2d 789 (1994); <u>Wieboldt Stores, Inc. v. Schottenstein</u>, 94 B.R. 488, 504 (N.D. Ill. 1988) ("A general scheme or plan to strip the debtor of its assets without regard to the needs of its creditors can support a finding of actual intent.") (citing <u>In re F & C Services, Inc.</u>, 44 B.R. 863, 872 (Bankr. S.D. Fla. 1984)). Where a debtor systematically reduces his estate leaving virtually nothing for creditors, the conveyances may be fraudulent. <u>Dorocke v. Farrington</u>, 43 Ill. App. 2d 394, 397, 193 N.E.2d 593, 594 (1963) (debtor systematically transferred his assets over the course of several years). Counsel for Defendants contended at trial that the transfers must be viewed as individual transfers, and therefore none of them, viewed individually, stripped Debtors of all their assets nor rendered them insolvent. However, the weight of authority does not support that view, as the foregoing cited authorities made clear.

erred overall in its determination of the facts and its legal conclusion, including that it failed to properly characterize the "suspicious circumstances" as evidence of actual intent, it failed to make additional findings that are important to the HRS § 651C-4 analysis of actual intent, and it erred in its conclusion that the Schmidts failed to demonstrate, by clear and convincing evidence, Realty Finance's actual intent to hinder, delay, or defraud any of its creditors; and (b) arguments that, based on the foregoing errors, including the previously-discussed errors in FOFs 5, 7, 8, and 9, the Circuit Court erred when it dismissed the Schmidts' fraudulent transfers claims, entered judgment against them, and failed to award them damages, interest, attorneys' fees, and costs. This section deals primarily with the first set of arguments, deferring the latter contentions of error to the following section and the conclusion of this Opinion.

As set forth above, HRS § 651C-4(b) provides a *non-exclusive* list of factors that may either support, negate, or, in some instances, not have an effect on the determination of an UFTA debtor's actual intent to hinder, delay, or defraud an UFTA creditor. We review each in turn, as well as unenumerated factors that appear in the record:

HRS § 651C-4(b)(1). The transfer or obligation was to an insider. As re-affirmed in their Answering Brief, Appellees have never disputed that the allegedly fraudulent transfers were made to or for the benefit of "insiders," as defined in HRS § 651C-1. Instead, Appellees argue that "this fact alone is not

helpful, much less determinative, in assessing [Appellees']
actual fraudulent intent, where the other factors indicated an
absence of *scienter*."[18]

While, alone, the undisputed fact that the allegedly
fraudulent transfers were made to or for the benefit of insiders
is not determinative, it is significant.  As stated in the
official Comments to § 4 of the National Conference of
Commissioners on Uniform State Law's Uniform Fraudulent Transfer
Act, upon which HRS Chapter 651C was based:

> The fact that a transfer has been made to a relative or to
> an affiliated corporation has not been regarded as a badge
> of fraud sufficient to warrant avoidance when unaccompanied
> by any other evidence of fraud.  **The courts have uniformly
> recognized, however, that a transfer to a closely related
> person warrants close scrutiny of the other circumstances,
> including the nature and extent of the consideration
> exchanged.**

Uniform Fraudulent Transfer Act 7A Part II (U.L.A.) § 4, cmt. 5,
p. 60 (2006) (citation omitted; emphasis added).

HRS § 651C-4(b)(2).  The debtor had retained possession
or control of the property transferred after the transfer.
Realty Finance did not retain possession or control of the
transferred funds.

HRS § 651C-4(b)(3).  The transfer or obligation was
disclosed or concealed.  Although the allegedly fraudulent
transfers by Realty Factors were not contemporaneously disclosed
to the Schmidts (or, it appears, disclosed at any time prior to
Chagami's deposition in July of 2005), as the Circuit Court
found, concealment was not established.

---

[18]     As discussed above, the actual intent at issue in HRS § 651C-
4(a)(1) is that of the transferor, Realty Finance.

HRS § 651C-4(b)(4). Before the transfer was made or obligation was incurred, the debtor was sued or threatened with suit. This factor is well-established and the circumstances here provide strong evidence of Realty Finance's actual intent to hinder, delay, or defraud the Schmidts. As the Circuit Court discussed in FOF 8.d., Realty Finance was actively involved in litigation over the funds at issue when they were transferred to or for the benefit of Realty Finance insiders. See Achiles v. Cajigal, 39 Haw. 493, 498 (1952) (a pre-UFTA case holding, *inter alia*, that "[p]roof of pending or anticipated litigation at the time of the transfer is one of the most commonly recognized indicia which would bear upon [the] issue of the debtor's intent to defeat the claim of creditors") (citation omitted); see also, e.g., Rich v. Rich, 405 S.E.2d 858, 864 (W.Va.1991) ("The timing of this transfer simply cannot be disregarded. The fact that it occurred two weeks after the first arrearage order was entered, while an appeal on a related matter was pending . . . cannot be overlooked. As [UFTA] makes clear, the proximity of a transfer to the incurrence of a substantial debt is a factor indicative of 'actual intent.'"). Notwithstanding the testimony of Chagami, Richard, and Eleanor, who professed not to have (personally) known that the Schmidts were still litigating their entitlement to the funds,[19] Realty Finance had knowledge of the litigation.

---

[19] The Circuit Court made no record of its assessment of their credibility in this regard. We note, however, that Richard and Chagami, who testified that the two of them made the decision to disburse the funds, were well enough informed about the status of the foreclosure action to make the disbursements "immediately after receipt of the proceeds of the foreclosure sale" as set forth in FOF 8.c.

It is undisputed that: (1) at all relevant times in the foreclosure proceedings, the Schmidts opposed, objected to, and sought relief from the order that distributed the proceeds of the sales of the mortgaged properties to Realty Finance; and (2) Realty Finance, which was prosecuting the "revived" foreclosure proceedings and actively arguing in favor of its claim to the sales proceeds (and against the Schmidts' claim), was represented by its attorneys, the Ashford & Wriston law firm, who were well aware of the Schmidts' claim, as evidenced by those proceedings. It is axiomatic that a corporation's attorneys act as the corporation's agents in litigation. See, e.g., Oahu Plumbing & Sheet Metal, Ltd. v. Kona Constr., Inc., 60 Haw. 372, 377-78, 590 P.2d 570, 574 (1979) (holding that non-attorney agents are not allowed to represent corporations in litigation). Thus, Realty Finance was (at a minimum) charged with the attorneys' knowledge of the Schmidts' active claims, notwithstanding Richard and Chagami's testimony that they decided to immediately disburse the funds, i.e., execute those four allegedly fraudulent transfers, without consulting their attorneys. See, e.g., Daiichi Hawaii Real Estate Corp. v. Lichter, 103 Hawai'i 325, 347, 82 P.3d 411, 433 (2003) ("a corporation, once charged with knowledge of a particular transaction or event, continues to be affected by such knowledge" notwithstanding any individual corporate personnel's lack of personal knowledge) (citation omitted); Imperial Fin. Corp. v. Finance Factors, Ltd., 53 Haw. 203, 205-06, 490 P.2d 662, 663-64 (1971) (knowledge of a corporation's agent is generally imputed to its principal). Indeed, it would be

reasonable to infer that Harris Hirata, whom Richard described at trial as the person who "ran Realty Finance," had direct knowledge of the ongoing nature of the Schmidts' claims because at Realty Finance's October 2000 Board Meeting, Mr. Hirata reported to the Board on the status of the foreclosure proceedings, including that the case was on appeal.

HRS § 651C-4(b)(5). The transfer was of substantially all the debtor's assets. The Circuit Court made no post-trial findings addressing this factor. The lack of findings on this point, coupled with the lack of findings concerning the evidence of Realty Finance's other transfers to HSC (noted in Section IV.A.1. above), makes it difficult to conclusively determine whether or not this factor was established. We note, however, that the Circuit Court found in the Pre-trial Order: "Although it may be true that Realty Finance retained enough cash to pay for its current operations, the transfers resulted in its inability to satisfy Plaintiffs' judgment against it." This finding was undisturbed by the Circuit Court's post-trial rulings, although the court was free to re-examine it, and it is unchallenged on appeal; therefore, this finding constitutes an operative fact in this case. See, e.g., Querubin v. Thronas, 107 Hawai'i 48, 60, 109 P.3d 689, 701 (2005) ("so long as a trial court retains jurisdiction, it always has the power to reexamine, modify, vacate, correct and reverse its prior rulings and orders") (citations and internal quotation marks omitted); Cun-Lara v. State, 126 Hawai'i 541, 544 n.5, 273 P.3d 1227, 1230 n.5 (App. 2012) ("'Findings of fact that are unchallenged on appeal

40

are the operative facts of a case.'") (quoting Robert's Haw.

Sch. Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawaiʻi 224, 239,

982 P.2d 853, 868 (1999), *superseded by statute on other grounds*

*as recognized in* Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, 113

Hawaiʻi 77, 107, 148 P.3d 1179, 1209 (2006)).

HRS § 651C-4(b)(6). The debtor had absconded. Realty

Finance did not secret itself, escape, or otherwise abscond to

avoid detection.

HRS § 651C-4(b)(7). The debtor had removed or

concealed assets. Except for the funds that were "upstreamed" to

or for the benefit of HSC, there is no evidence that Realty

Finance removed or concealed assets.

HRS § 651C-4(b)(8). The value of the consideration

received by the debtor was reasonably equivalent to the value of

the asset transferred or the amount of the obligation incurred.

As discussed in Sections IV.A.2. and IV.A.7. above, the Circuit

Court clearly misapprehended this factor and erred when, instead

of finding no consideration of reasonably equivalent value, it

referenced *bona fide* obligations and legitimate business

purposes. To recap this prior discussion: (1) under the

relevant UFTA provision (see HRS § 651C-3(a)), value is given for

a transfer if, in exchange, an antecedent debt is satisfied; (2)

the distribution or return of a capital contribution is not a

transfer for value; (3) here, Realty Finance owed no debt to HSC

or the transferees; and (4) therefore, Realty Finance's transfer

of funds to or for the benefit of HSC to "repay" HSC's capital

contributions was without fair consideration and was not a

transfer for reasonably equivalent value. See, e.g., Rocky Mountain Holdings, Inc., 782 F. Supp. 2d at 122-23; Hullett, 63 P.3d at 1035-36; Yankee Microwave, Inc., 760 N.E.2d at 760; Tanzi, 414 A.2d at 489; In re Lexington Oil & Gas Ltd., Co., 423 B.R. 353; and In re Dewey & LeBoeuf LLP, 518 B.R. at 789-90 (as discussed in Section IV.A.2 above).

HRS § 651C-4(b)(9). The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. As discussed in Section IV.A.9. above, on appeal, the Schmidts failed to adequately support their argument that the Circuit Court clearly erred in finding that the four allegedly fraudulent transfers that took place immediately after Realty Finance received the foreclosure sales proceeds did not render Realty Finance insolvent "shortly after" those transfers occurred. Nor, based on the HRS § 651C-2 definition of insolvency, can we conclude that Realty Finance was insolvent at the time of those transfers. However, as further discussed above, the evidence presented by the Schmidts tends to show that the allegedly fraudulent transfers were part of an overall series of transactions intended to "upstream" nearly all of Realty Finance's assets to or for the benefit of its insider investors, to the detriment of the Schmidts, who were actively litigating their claims against Realty Finance.

HRS § 651C-4(b)(10). The transfer had occurred shortly before or shortly after a substantial debt was incurred. Realty Finance's debt to the Schmidts was incurred when it received the foreclosure sales proceeds that were due to the Schmidts.

Particularly in light of the undisputed fact that Realty Finance was no longer operating as a Thrift and was in the process of winding down its business, this was clearly a substantial debt that was incurred shortly before the allegedly fraudulent transfers were executed.

HRS § 651C-4(b)(11). The debtor had transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor. This factor is not implicated in this case.

Other factors, not specifically enumerated in HRS § 651C-4(b). In addition to the specific HRS § 651C-4(b) factors discussed above, there are additional relevant facts evidenced in the record of this case.

HRS § 651C-4(b)(10) addresses the timing of the allegedly fraudulent transfers vis à vis the incurring of the debt to the Schmidts, but does not fully address another relevant timing consideration. The transfers were made, to the benefit of Realty Finance insiders, at the time that Realty Finance was in the process of winding down or going out of business. As Richard testified at trial, in the year 2000 alone, Realty Finance "upstreamed" or distributed $986,655 of cash to or for the benefit of HSC. Thus, with the systematic depletion of its remaining assets as they became liquid, Realty Finance eliminated all possible sources for the payment of the Schmidts, who were indisputably creditors, as defined in UFTA. Indeed, Richard, a certified public accountant, testified that he (along with Chagami) was the Realty Finance decision-maker who decided to

43

make the allegedly fraudulent transfers. We cannot ignore the fact that, as one of the transferees, the President of and major investor in HSC, and the husband of Eleanor, Richard personally benefitted, directly or indirectly, from all of the transfers which, in fact, hindered and delayed the Schmidts' efforts to recover the foreclosure sales proceeds that were erroneously paid to Realty Finance.

Relatedly, notwithstanding that Realty Finance was going out of business and had essentially no source of future income to pay its debts, *none* of the recipients of the allegedly fraudulent transfer were creditors of Realty Finance. Nor was HSC, the sole shareholder in Realty Finance, a creditor of Realty Finance.

Also, while perhaps less significant than Richard's dual role as benefactor and beneficiary, as the Circuit Court found in FOF 8.b., the allegedly fraudulent transfers were made through a separate bank account that was apparently created to effectuate the transfers. There was no evidence of any business purpose in creating that separate account. Richard and Chagami testified that they did not recall why they opened the separate account. The account appears to have been employed with haste, as imprinted checks were not used. Although the actual reasons that this account was used is not clear, while Realty Finance was ending its business and winding up its affairs, it is indeed a suspicious circumstance.

Finally, while other aspects of the Schmidt litigation were the subject of Realty Finance board meetings and decisions,

44

there was no board action taken and no consultation with counsel was had before the transfer decision was made, notwithstanding the years of litigation that preceded Realty Finance's receipt of the foreclosure sales proceeds.

11.   Clear and Convincing Evidence of Realty Finance's Actual Intent to Hinder, Delay, or Defraud its Creditors

The "suspicious circumstances" identified by the Circuit Court in FOFs 8.a.-8.d. constitute badges of fraud or indicia of Realty Finance's actual intent to hinder, delay, or defraud its creditors.  In addition, the Circuit Court clearly erred in significant respects in its findings in FOFs 9.a., 9.c., and 9.d., and wrongly viewed its findings in FOF 9.b. as negativing the badges of fraud.  As recounted above, the Schmidts established many of the clearest, most compelling, and most widely recognized indicia of Realty Finance's actual intent to hinder, delay, or defraud creditors under UFTA, i.e., HRS § 651C-4(a)(1) and (b).  Ample, clear, and convincing evidence of Realty Finance's actual intent to hinder, delay, or defraud creditors exists, including the following indicia of fraudulent intent: Realty Finance's transfers of funds were made to or for the benefit of insiders who were not creditors of Realty Finance; the transfers were made while litigation over the transferred funds was pending; prior to the litigation being completed, Realty Finance "upstreamed" nearly all of its assets to or for the benefit of its insider investor, leaving it unable to pay the Schmidts; Realty Finance received no consideration of reasonably equivalent value for the transfers; the transfers occurred

immediately after Realty Finance's substantial indebtedness to the Schmidts was incurred; the transfers were made while Realty Finance was winding up its business, thus leaving no foreseeable source to pay its UFTA creditors, the Schmidts; and the other relevant facts discussed in Sections IV.A.1.-10. above. Accordingly, we conclude that the Circuit Court was wrong to conclude in COL 5 that the facts established by the record in this case "did not prove by clear and convincing evidence that [Realty Finance] actually intended to hinder, delay, or defraud any creditors of [Realty Finance], as required by HRS § 651C-4(a)(1)."

B.   The Cross-Appeal

1.   Statute of limitations

Appellees maintain that the Schmidts' UFTA claims were time-barred under HRS § 651C-9(1) (1993), which states the following:

> **§ 651C-9  Extinguishment of cause of action.**  A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:
>
> (1)   Under section 651C-4(a)(1), within four years after the transfer was made or the obligation was incurred or, if later, <u>within one year after the transfer or obligation was or could reasonably have been discovered by the claimant</u>;
>
> . . . .

(Emphasis added.)

The allegedly fraudulent transfers were made (primarily) in February of 2000.  The Schmidts filed the Complaint herein on April 7, 2006.  Thus, the Schmidts' fraudulent transfers claims would be untimely, pursuant to HRS § 651C-9(1), unless suit was filed "within one year after the

transfer or obligation was or could reasonably have been discovered" by the Schmidts. See also Schmidt II, 131 Hawaiʻi at 511-12, 319 P.3d at 430-31. In Schmidt II, the supreme court held that this one-year period begins "when a plaintiff discovers the fraudulent nature of a potential transfer," rather than simply the transfer itself. Id. at 507, 510, 319 P.3d at 426, 429.

Here, the Schmidts contend that they did not discover the fraudulent nature of the transfers until July 26, 2005, or, at the earliest, April 20, 2005. July 26, 2005 was the date when the Schmidts' counsel deposed Chagami, who testified that Realty Finance transferred the foreclosure sale proceeds to HSC for the purposes of satisfying several of HSC's obligations and that Realty Finance was insolvent as of December 2004. April 20, 2005 was the date when the Schmidts' counsel received copies of the four checks and discovered to whom the funds were transferred.

Appellees argue that, notwithstanding the purported "actual" date of the Schmidts' discovery, with any level of diligence, the Schmidts would have discovered the purportedly fraudulent transfers, including that the transfers were made to and/or for the benefit of insiders, long before April 20, 2005. Appellees note various "tools" that the Schmidts could and should have used to discover the transfer earlier. For example, Appellees point to an August 2004 discovery request by the Schmidts that was purportedly "abandoned by the Schmidts and never pursued." Appellees contend, inter alia, that the Schmidts could and should have commenced discovery of their UFTA claims

forthwith upon the supreme court's March 18, 2004 decision in their favor. The Schmidts, on the other hand, argue that they were unable to obtain a final judgment, on remand, until December 21, 2004, and they proceeded diligently thereafter. Appellees invite this court to determine, as a matter of law, that the alleged fraudulent transfers "could reasonably have been discovered" more than one year prior to the filing of this suit. We decline to do so.

The Hawai'i Supreme Court has held that "[r]easonableness can only constitute a question of law . . . when the facts are undisputed and not fairly susceptible of divergent inferences, because, where, upon all the evidence, but one inference may reasonably be drawn, there is no issue for the jury." Courbat v. Dahana Ranch, Inc., 111 Hawai'i 254, 263, 141 P.3d 427, 436 (2006) (citation and internal quotation marks omitted); see also, e.g., Willis v. Swain, 129 Hawai'i 478, 496, 304 P.3d 619, 637 (2013), Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 87, 839 P.2d 10, 15 (1992). In this case, we cannot say that reasonable minds could only draw one inference from the purportedly undisputed facts concerning when the Schmidts could reasonably have discovered both the insider transfers and their allegedly fraudulent nature. Indeed, as observed by the supreme court in Schmidt II, the Circuit Court did not issue any findings or legal conclusions regarding when

the Schmidts discovered, or reasonably could have discovered, the "fraudulent nature" of the transfers.  Thus, this court necessarily remands this issue for a decision, in the first instance, by the Circuit Court.

2.    Attorneys' Fees

In light of our disposition on the merits of the parties' appeals, a final determination of whether Appellees are entitled to attorneys' fees cannot be made, as the prevailing party must be determined on remand.  See Schmidt II, 131 Hawai'i at 512, 319 P.3d at 431.  However, as asserted by Appellees, the Circuit Court erred in failing to timely decide their motion for fees and costs, resulting in the motion being deemed denied pursuant to HRAP Rule 4(a)(3).

V.    CONCLUSION

For these reasons, the Circuit Court's October 7, 2008 Final Judgment is vacated and this case is remanded for further proceedings consistent with this Opinion.  Specifically, the Circuit Court must determine whether the Schmidts' fraudulent transfers are time-barred and, if they are not, the Circuit Court shall enter judgment in favor of the Schmidts in amounts to be determined by the Circuit Court, including determination of the Schmidts' claims for pre-judgment interest, post-judgment interest, attorneys' fees and taxable costs.  If the Schmidts' fraudulent transfers claims are determined to be time-barred, the

Circuit Court shall enter judgment in favor of Appellees, and a renewed request by Appellees for attorneys' fees and costs shall be timely considered.

On the briefs:

R. Steven Geshell
        and
Thomas P. Dunn
for Plaintiffs-Appellants
and Cross-Appellees

Paul Alston
Stephen M. Tannenbaum
(Alston Hunt Floyd & Ing)
for Defendants-Appellees
and Cross-Appellants